**CITY OF HOUSTON, Appellant,**

v.

**HOWE & WISE, Appellees.**

No. 13360.

Court of Civil Appeals of Texas.

Houston.

March 12, 1959.

Rehearings Denied April 16, 1959.

R. H. Burks, City Atty., Houston, Edgar Pfeil and Homer T. Bouldin, Senior Asst. Attys., Houston, for appellant.

Fred Parks and Fred A. Collins, Houston, for appellee.

WERLEIN, Justice.

Appellees, W. F. Smith and Jason Umber, partners under the firm name of Howe & Wise, brought this suit against appellant, City of Houston, to recover compensation or fees for supervisory engineering services in connection with the San Jacinto River Water Supply Project, known as Lake Houston, alleging that they were entitled to be paid for their engineering services 5% of what it cost appellant to do the work, as provided in a written contract entered into by them and appellant on February 1, 1951. They alleged that they were paid $102,663.52 for work ac-

tually performed under the contract and that an additional amount of $96,988.62 was due them for engineering services which they allege they were to perform under the contract but were prevented by appellant from performing. They also claimed $13,-601.70 for engineering services performed by them but not provided for in the written contract, and $35,000 attorney's fees.

Judgment was rendered on the jury verdict in favor of appellees against appellant for the sum of $110,627.02 with interest and costs, not including attorney's fees which the court held appellees could not recover. Appellant has duly perfected its appeal to this Court, assigning 181 points of error in a brief of 250 pages. Manifestly it will be impossible to discuss all of such points seriatim without extending this opinion beyond all reasonable bounds.

Appellant's Points 1 to 9, asserting that the Trial Court erred in overruling its special exceptions 1 through 6, and 8 through 10, to appellees' petition, are overruled. Contrary to appellant's contention, appellees' second amended original petition, on which the case went to trial, alleges the duties and obligations resting upon appellees with respect to furnishing certificates of performance and certification of estimates and sufficiently alleges performance of such duties and obligations and compliance with the conditions prerequisite to the right of payment. With reference to appellant's exception that appellees did not allege that Frank N. Baldwin, Director of Public Utilities for the City of Houston, had authority to make representations binding on the City, it should be noted that appellees' cause of action was not brought to recover damages for fraud or false representations on the part of Baldwin, but to recover on the contract including that portion thereof which appellant contends was waived by appellees' letter which they say was induced by Baldwin's representations. Appellant cannot claim the benefit of a waiver and in the same breath deny the authority under which it was pro-

cured. It is immaterial, however, whether appellant is bound by the acts of Baldwin in such connection since appellees merely seek to set aside the alleged waiver. The allegations in the petition are clear and adequate with respect thereto.

Appellant's next Points of Error, Nos. 179 to 181, assert that the Trial Court erred in permitting appellee W. F. Smith to testify as to his duties and the services performed by him under the contract, and also as to services not contemplated by the contract but which he in fact performed at appellant's request.

■ Appellant has cited several cases to the effect that in cross-examining appellee Smith in connection with his testimony as to his duties under the contract, it did not waive its objection to his testimony. We agree with appellant's contention. Appellant, however, in examining its own witness, Mason G. Lockwood, a consulting engineer, interrogated such witness as to the kind of acreage survey which was required by the contract, and as to payment being made on an acreage basis, and other matters with respect to the contract. Appellees contend that since said witness was called to give his opinion as to the proper construction of the contract, any error on the part of the Court in admitting the testimony of Smith was waived. 1 McCormick and Ray, Texas Law of Evidence, Sec. 27, p. 27; Minchen v. First National Bank of Alpine, Tex.Civ.App., 263 S.W.2d 601, writ ref., n. r. e.; Security Banking & Investment Co. v. Flanagan, Tex.Civ.App., 241 S.W. 702, reformed in part and affirmed in part, Tex.Com.App., 254 S.W. 761. It is our opinion that appellant cannot complain because of the introduction of the testimony of appellee Smith with respect to certain duties and work under and outside the contract in view of its introduction of similar evidence by Lockwood. Further, Smith's testimony had to do mainly with his performance under the contract rather than its construction.

We shall consider appellant's Points 10 and 11 with respect to the alleged error of the Court in overruling appellant's motion for an instructed verdict, in connection with other Points, including 14, 15, 18, 19, 22 to 24, 27, 28, 65, 66, 73, 102, 104, 109, 113, 127 to 129, which appellant has grouped together.

Appellant asserts under the above numbered Points that the Trial Court erred in submitting Special Issues Nos. 1, 2, 3, 3–A, 4, 11, 11–A, 12, 17, 17–A, 18 and 19, all of which were answered favorably to appellees, because each of such issues involved a question of law or a mixed question of law and fact. Omitting answers, definitions and instructions, and Special Issues 17, 17–A and 18, which are, except for numbers, identical with Issues 11, 11–A and 12, said Issues are as follows:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that under the terms of the contract entered into between the City and Howe & Wise, there is presently a balance due Howe & Wise under the three clearing contracts?

"Special Issue No. 2

"From a preponderance of the evidence, what amount, if any, do you find is presently due and owing Howe & Wise under the three clearing contracts?

"Special Issue No. 3

"Do you find from a preponderance of the evidence that the written contract called for Howe & Wise to perform services on each and every one of the following pipelines:

"Pan American Pipeline Company, Magnolia Pipeline Company, Sinclair Pipeline Company, Sun Pipeline Company and Texas Pipeline Company.

"Special Issue No. 3–A

"Do you find from a preponderance of the evidence that the City prevented Howe & Wise from doing work as provided in the written contract, if you have so found, on each and every one of the following pipelines:

"Pan American Pipeline Company, Magnolia Pipeline Company, Sinclair Pipeline Company, Sun Pipeline Company and Texas Pipeline Company.

"Special Issue No. 4

"Do you find from a preponderance of the evidence that such action on the part of the City, if you have so found, as is inquired about in the foregoing Special Issue Nos. 3A, was wrongful?

"Special Issue No. 11

"Do you find from a preponderance of the evidence that the written contract between Howe & Wise and the City provided for Howe & Wise to perform work on the railroad?

"Special Issue No. 11–A

"Do you find from a preponderance of the evidence that the City prevented Howe & Wise from doing work on the railroad as provided, if you have so found, in the written contract?

"Special Issue No. 12

"Do you find from a preponderance of the evidence that such action on the part of the City, if you have so found, as is inquired about in the foregoing Special Issue No. 11 A, was wrongful?

"Special Issue No. 19

"Do you find from a preponderance of the evidence that an acreage survey of each of the three clearing contracts was not within the scope of the contract?"

In determining whether or not the Court erred in submitting said Issues, it becomes necessary to examine the pleadings of the parties and certain provisions of the contract with respect to their definiteness or lack thereof, and also with respect to the contract's completeness or need for evidence in aid of its interpretation. We find that appellees' amended petition adequately and fully sets out their position and contentions as to the work done under the contract and work not included within the contract. The contract itself does not set out in detail or with any degree of definiteness the duties to be performed by appellees, who are called "Engineer" in the contract. It provides that Engineer's employment is for engineering services incident to the clearing of the reservoir area and the removal, re-arrangement and/or relocation of a railroad and certain pipelines which cross the reservoir area, including the area on which the dam itself will actually rest. It further provides that, "While for convenience the Engineer's services in connection with the clearing and in connection with the removal of such existing facilities or their re-arrangement, etc., will be separately described, this is a single entire employment for the entire engineering services involved in all of the work herein referred to." The contract then takes up the "marking and clearing of reservoir site" and what is described as "Phase 1" and "Phase 2".

Under Section or paragraph B of the contract, entitled "Supervising the arrangement, removal or relocation of the railroad and pipelines" it is stated that there is a railroad and a large number of pipelines crossing the reservoir area; that agreements had not yet been reached between the City and the owners of such facilities as to the extent to which they may severally remain in their present location with or without any re-arrangement or any additional construction, and no agreement had been reached with respect to the cost of any removal, relocation or re-arrangement

of such facilities which will be borne by the City.

The contract then provides:

"The City and the Engineer both realize that the foregoing description of the Engineer's services and duties under this part of his employment is extremely general. It shall, however, be fairly construed to require the Engineer in connection with the work actually done in the matter of the present facilities within the reservoir area, to perform those engineering services which the City in ordinary prudence would find it necessary to perform for itself if this agreement had not been entered into."

The contract provides that the City will make available to the Engineer all of its existing plans, maps, field notes, statistics, computations and other data relative to the entire project. It also provides that the Engineer may go ahead and do such work as he desires in the matter of the preparation of clearing specifications, and then states:

"The Engineer's services in connection with the re-arrangement, removal, or relocation or abandonment of the existing utilities within the reservoir area, will, of course, be performed as the necessity therefor arises, depending upon the agreements which from time to time are reached between the City and the owners of such facilities as to what is going to be done about them."

The contract further provides that the Engineer shall receive a fee for his services which shall be 5% of the actual cost to the City of the work of clearing of the reservoir site and of the re-arrangement, removal or replacement of the railroad and/or the pipelines within the reservoir area.

Appellant takes the position that appellees have not pleaded that the contract in question is ambiguous or induced through fraud, accident or mistake, and that hence there were no issues in the case regarding appellees' duties, performance or prevention of performance under the contract. They have cited a number of cases holding that it is improper to submit issues involving questions of law or questions of mixed law and fact to the jury in the absence of a pleading of ambiguity, fraud, accident or mistake.

It is elementary that the construction of a contract is for the court and not the jury. Tower Contracting Co., Inc. v. Flores, Tex.Sup., 302 S.W.2d 396. Nor is it admissible to construe by parol testimony a written contract and thus prove its contents when the contract itself is before the court and is free from ambiguity. City of San Antonio v. Lewis, 9 Tex. 69; Brown v. Payne, 142 Tex. 102, 176 S.W.2d 306. In Gulf States Equipment Co. v. Toombs, Tex.Civ.App., 288 S.W.2d 203, writ ref., n. r .e., it was held that the court improperly submitted to the jury the issue as to whether the appellee *breached his contract*. See Southern Travelers' Ass'n v. Wright, Tex.Com.App., 34 S.W.2d 823.

Appellant has cited other cases which hold that no question of pure law nor any question involving a mixed question of law and fact should be submitted to a jury for finding. It will be noted, however, that in such cases the contract construed was unambiguous and definite in its terms, so that it was unnecessary for the court to consider the circumstances surrounding the making of the contract or the construction placed upon the contract by the parties thereto in order to properly construe it.

Appellees contend that while they did not use the word "ambiguous" in their pleadings, the very terms of the contract which was attached to the petition, show that some of the provisions of the contract are ambiguous and that in order to place a proper construction thereon it became necessary to develop what was done under the contract and what was contemplated by

the parties. They point also to the pleadings of the appellant denying that appellees were entitled to anything under the contract, and contend that in construing the contract the pleadings of the appellant as well as their own pleadings may be considered by the court. Ray v. Barrington, Tex.Civ.App., 297 S.W. 781.

The contract in question is very indefinite as to the details of the work to be done by the Engineer in connection with the clearing of the reservoir site, and the removal of the pipelines and railroad. No clearing contract is set out in the agreement between the parties and no pipelines are specifically mentioned or named in such agreement. Hence it was impossible without parol testimony to show what clearing contracts were entered into pursuant to the contract in question or what facilities were removed or how much the City paid to the various pipeline companies. Appellee Smith testified without objection to the three clearing contracts that were entered into and that he was claiming 5% of whatever had been paid by the City on such contracts. Exhibit No. 54 was admitted in evidence over the objection of appellant that the evidence did not show how many of the payments made to the clearing contractor, Wade Lahar, had been certified. Smith had previously testified, however, that he had furnished a certificate as to the work done by the other people in the area. Moreover, there was testimony without objection, as to what land had to be cleared and that appellees' duty was to prepare bids and prepare specifications for clearing of some 15,000 acres, and that they supervised the work. Smith also testified without objection as to the amounts paid by the City on the three clearing contracts and that he was claiming 5% of such amounts. The jury found that the balance due on the clearing contracts was $3,755.90, which conformed to the amount shown in Exhibit No. 54.

There was also testimony as to the duties performed by the Engineer in connection with the pipelines, including conferences with representatives of the various pipeline companies and advice to appellant relative to reconditioning or replacing pipelines. Appellee Smith testified that certain work could not be done because the City failed to furnish certain specifications and plans, etc. that it was required to furnish, but that he inspected the work as best he could without specifications. He also testified without objection that there were only two out of all the utilities in the area contemplated by the contract on which he had specifications, being Magnolia and United Gas, and that in the case of all the others he was unable to perform his engineering services as contemplated by the contract for the want of such specifications, although he requested the specifications and agreements from the City. He further testified that the inspectors he had on the work could have handled the additional pipelines had he been furnished the specifications, and that the City prevented him from completing the work called for in the contract on the pipelines, with the exception of Magnolia and United Gas.

It was also shown that appellant employed the engineering firm of Freese, Nichols and Turner primarily to negotiate with the pipeline companies as to the damages they would actually suffer by reason of the flooding of the reservoir area. Mr. Sears, City Attorney at the time, testified that it was necessary to confer with the pipeline companies in connection with their claims, and he recommended that Freese be employed. He also stated with respect to the controversy with the pipelines, "We had no way of ascertaining we owed the pipelines anything." After hiring Freese, appellant entered into separate contracts with each company. We think the evidence sufficiently shows that the engineering firm of Freese, Nichols and Turner was employed to perform engineering services that came within the provisions and terms of appellees' contract and which they were prevented from performing, and

# 142

that the Trial Court did not err, therefore, in allowing appellees to recover for services which they were prevented from performing in connection with the pipeline companies named in Special Issues Nos. 3 and 3–A.

Appellees proved what the various pipeline companies were paid, including the two on which the Engineer had specifications and the five upon which he had no specifications. 5% of the total amount, less what had been paid the Engineer, amounted to $18,295.92, which was the amount allowed by the Court on the findings of the jury for the work done on the pipelines, and work the Engineer was prevented from doing.

■ We think parol evidence was properly admitted by the Court. Much of it was admitted without objection or adduced by appellant's counsel. The testimony admitted was not for the purpose of construing the contract but to show the duties that were required and performed under the contract, which were not set out in the contract in detail or with sufficient certainty to identify them.

■ While the issues complained of seem to call for questions of law or of mixed law and fact, we think that the Court did not err in submitting them to the jury in light of the testimony and the necessity of determining whether the clearing contracts and the work on the pipelines came within the contract. It was necessary for the jury to find that the clearing and pipelines in question were in the reservoir area and that the work that appellees performed or were wrongfully prevented by the City from performing, came within the provisions of the contract, in order for appellees to recover from the City.

In Gray v. Blau, Tex.Civ.App., 223 S. W.2d 53, 57, while appellee Blau was testifying in regard to the performance of the construction contract, he was asked, "What were your duties?" He answered

at length some of the things he did. Appellant's objection that the contract spoke for itself, was overruled. The Court of Civil Appeals stated:

"Obviously the testimony objected was not 'concerning the provisions of the written contract itself,' but it concerned only what the witness did. This point presents no error and is overruled."

In Gray v. Shaunfield, Tex.Civ.App., 212 S.W.2d 873, 875, no writ history, it was stated: "It is elemental that the intention of the parties to a contract controls its interpretation." It was further held that when a written contract is ambiguous or so uncertain in its terms as to render the contractual obligations assumed by either party fairly susceptible of more than one interpretation, the true intent and meaning thereof becomes an issue of fact if the extrinsic evidence relating thereto is in dispute or is such that reasonable minds may differ in the ultimate conclusions of fact to be drawn therefrom.

In the present case it became necessary as the work under the contract proceeded and developed to identify the particular pipelines that would be included therein and the particular area that would be cleared. As stated in 2 McCormick and Ray, Texas Law of Evidence, Sec. 1684, p. 525:

"One of the most frequent and obviously necessary types of interpretative evidence is that which is offered to identify the chattels, tracts of land or other subject matter of the transaction."

In Kiggins v. Kennon, Tex.Civ.App., 197 S.W.2d 182, 183, writ ref., n. r. e., decided by this Court, appellant complained of the submission to the jury of the written contract for construction of its meaning. The jury found in answer to Special Issue No. 1 that both plaintiff and defendant did not intend that "the contract in question should bind and obligate the defendant to

pay plaintiff a 10% royalty on the minimum sales provided for in the contract so long as the contract remained uncancelled or otherwise." The Court stated that if the meaning of the provision in question was ambiguous, then the issue as to its true meaning was one of fact for the jury.

In Curry v. Texas Co., Tex.Civ.App., 8 S.W.2d 206, 211, writ dism., the Court stated:

"It is an important rule of construction that a written contract, plain and reflecting no shadow of doubt as to its meaning, shall be the sole evidence of the intention of the contracting parties. But, if the contract is not clearly unambiguous, the rule should not be permitted to defeat an intention and understanding which can be clearly proven by parol, and to lead to a conclusion which is absurd."

We quote from Greene Gold-Silver Co. v. Silbert, Tex.Civ.App., 158 S.W. 803, as follows:

"Since the telegrams and letters are pleaded in haec verba, the petition, of necessity, must partake of whatever ambiguity exists therein, and in such case the pleader, by averment, must place some definite construction thereon, in order to cure the ambiguity and to support a judgment."

To like effect see Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 805, where it is stated:

"Appellees, in support of the contention that extrinsic evidence should be admitted to determine the intention of the parties as to what minerals should not pass to the grantee, invoke the rule that when an instrument does not by its terms plainly and clearly disclose the intention of the parties, or is phrased in language fairly susceptible of more than one interpretation, the intention is to be ascertained, not solely from the words of the instrument, but from its language when read in the light of the circumstances surrounding the transaction. We recognize that rule. It is supported by many authorities."

 If there was error in the submission of said Issues because of the fact that they call for a question of law or mixed law and fact, we think any such error was harmless. As stated in 3 McDonald, Texas Civil Practice, Sec. 12.37, p. 1169:

"Absent some showing of extraneous prejudice, the submission of a question of law is harmless: if it is answered as the court should have decided, it can hardly damage; if it is answered to the contrary, the finding would be immaterial and hence should be ignored."

In Smith v. Smith, Tex.Civ.App., 187 S.W.2d 116, 121, the Court stated:

"It is argued that there was no issue of fact to be determined by the inquiry but that it was one of law for the court. The contention is correct, but since the judgment of the court was to the same effect, no harm to appellant is presented on account of the submission of the issue. The court could have entered the same judgment under the provisions of Art. 4638, R.C.S., if no such issue had been submitted to the jury."

Supreme Forest Woodmen Circle v. Bryant, Tex.Civ.App., 109 S.W.2d 1091, no writ history; Rule 434, Texas Rules of Civil Procedure.

Appellant's next 73 Points have to do mainly with errors assigned in connection with the submission to the jury of some 20 Special Issues relating to the railroad. On the findings of the jury the Trial Court allowed appellees to recover $74,-973.50 for work on the railroad which the jury found the contract in question provided for, and which appellees were pre-

vented by the City from performing. Appellant, among other assignments of error, contends that the Trial Court erred in overruling its motion to disregard and set aside the answers of the jury to said Issues because there is no evidence to support the jury's answers thereto, and also erred in rendering judgment based upon the jury's findings because such findings are so against the overwhelming preponderance of the evidence as to be clearly wrong and unjust. Appellant relies largely upon an alleged waiver executed by appellees, reading as follows:

"December 17, 1951

"Mr. F. N. Baldwin
"Director of Public Utilities
"City Hall
"Houston, Texas

"Dear Mr. Baldwin:

"In the matter of the Missouri-Pacific Railroad construction through the Reservoir and Reservoir area, we agree that we will in no way be responsible for any of the engineering supervision on construction, and therefore will not expect any compensation from the City of Houston on this phase of the work.

"Very truly yours,
"HOWE & WISE
By: (signed) W. F. Smith
W. F. Smith
"WES/an
"cc: Hon. Mayor Oscar Holcombe
"Frank Beadle, Ass't City
Attorney"

Appellant asserts that it was error to submit any of the Issues relating to the railroad because: (1) as a matter of law appellees were not entitled to receive any fee for services under the written contract; (2) they waived by said letter of December 17, 1951, any fee they might have been entitled to under the contract; and, (3) the representation allegedly made by Baldwin relative to the amount appellant would pay the railroad company was not binding upon appellant because (a) if such statement was made it was merely the expression of an opinion and so understood, (b) appellees knew the real facts and had no right to rely upon such statement and (c) there was no evidence that Baldwin was authorized to make such statement, if it was made, and, therefore, appellant did not do any act of duress or coercion which caused appellees to waive the railroad properties compensation, even if appellees under the written contract were to have performed such services.

Appellees contend that the waiver is invalid because signed involuntarily on account of economic pressure. The jury found that on December 17, 1951, when the waiver was signed, the financial condition of appellees was such that it was an economic necessity that they be paid for their work done for the appellant prior to that date, and that Baldwin knew their financial condition was such that it was an economic necessity that they be paid and that he led appellee Smith to believe that Howe & Wise would not be paid for their services rendered prior to December 17, 1951, if Smith did not sign the waiver, and that he signed only because he had been led to believe by Frank N. Baldwin that Howe & Wise would not be paid for their services prior to that date, and that the conduct of Baldwin was such as to render the writing of the waiver involuntary on Smith's part, and that Smith did not intentionally relinquish claims of Howe & Wise to an engineering fee on the amount actually paid by the City.

We find no evidence in the record that Baldwin knew of the financial condition of appellees at the time the waiver was executed, as found by the jury in answer to Special Issue No. 14. Regardless of that fact it is our opinion that as a matter of law the circumstances with respect to the signing of the waiver were not such as to render the waiver an involuntary act on Smith's part because of alleged economic

necessity. It is true that at the time the waiver was signed, according to Smith's testimony, appellees were overdrawn between $350 and $400 at the bank, and had an estimated office cost of several hundred dollars a week, and Mr. Baldwin had told Smith that the City was holding up payment on a bill for $1,450 that had been submitted for work that had been done. The City questioned whether or not appellees were entitled to payment of such bill and two other bills later submitted, all together totalling $7,600, since they grew out of work in connection with the removal of certain pipelines in the reservoir area to locations outside thereof. In any event, at such time appellees were recognized engineers and business men who had a contract with the City under which they would probably receive as much as $94,500, according to estimate. Moreover, appellees' witness, J. Leland Collins, Assistant Vice President of the First-City National Bank, testified that appellees were allowed their overdrafts, and that it was not unusual for a firm doing a substantial amount of business to have an overdraft of the size of appellees'. It was also shown that appellees had other work at the time and that roughly only about 50% of their office and working expense was for work done for appellant.

The fact that appellees needed money may have been a reason for signing the waiver. However appellees undoubtedly knew they had rights under their contract and a legal remedy. We do not think the financial condition they were in can be considered such economic pressure as to render their act in signing the waiver involuntary. As stated by the Supreme Court of South Carolina in Farmers' & Merchants' Bank v. People's First National Bank, 161 S.C. 286, 159 S.E. 617, 619, "The voluntary character of an act relied on to show waiver must not be confused with the reasons prompting such act. A person's action may be due to cogent reasons and yet be entirely voluntary." See 92 C.J.S. Waiver p. 1055.

In Robert E. McKee, General Contractor, v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 396, our Supreme Court said:

"So far as we have been able to discover the courts of this state have never held that the necessity of performing his duties and of earning a livelihood was such economic compulsion or constraint as to render involuntary the workman's choice of accepting or retaining employment in the face of known and appreciated dangers."

If in that case economic compulsion or constraint did not render the workman's choice involuntary, a fortiori it did not render the signing of the waiver in question involuntary in the present case? See also Riggs v. Bartlett, Tex.Civ.App., 310 S.W.2d 690, writ ref., n. r. e.

While it is true that a waiver to be operative must be the voluntary relinquishment of a known right, we are of the opinion that appellee Smith was aware of his rights under the contract with respect to work that might be done by him in connection with the railroad, and at such time he knew there was litigation between appellant and the railroad, and that no one could tell what the City would finally pay to the railroad for the removal and relocation of its facility.

We, therefore, think that the waiver was voluntary and intentional and that the findings of the jury to the contrary are without support in the evidence. The Trial Court should have set aside and disregarded the jury's findings to Special Issues Nos. 13, 14 and 16-A, as prayed for by appellant in its amended motion for new trial and in its motion to disregard Special Issue findings.

We now consider whether such waiver was induced by fraud on the part of appellant. Appellees alleged and Smith testified that Baldwin stated to him that in no event would the City pay more than $50,000 to the railroad, that he thought that Baldwin knew

the inside of the case, and he had every reason to believe him; that he believed the statement to be truthful and in reliance thereon wrote the letter constituting the waiver. He then testified in answer to the question why he signed the waiver:

"Well, first of all, being in a financial strait, I figured I was going to trade $2,500.00 [5% on $50,000.00] for $7,-600.90. The second reason was, we had over the years done a lot of work for the City of Houston, and $2,500.00 worth of good will would not hurt us. I wanted to keep everybody I worked with at the City Hall in a good humor. Our firm had always enjoyed the friendship of the City and wanted to keep it that way."

He further testified that he would not have written the letter of December 17, 1951, had he known that the City would pay $1,500,000 to the railroad. Of course, no one at that time had any knowledge that it would.

The jury found that Baldwin did make the representation; that it was false; it was material; that he knew it was false and it was his intention in making it to induce Smith to sign the letter of December 17, 1951, waiving his fee on the railroad; that Smith signed the letter relying on the representation; that the contract in question provided for appellees to perform work on the railroad; that the City prevented them from doing so, and that the City's action was wrongful.

Since appellant contends that the jury's findings are unsupported by the evidence and against the great weight and preponderance of the evidence, it becomes necessary to consider other testimony and circumstances in connection with Smith's testimony and appellees' claim for compensation for work that they admittedly did not do on the railroad.

Appellee Smith testified that he knew that Baldwin in making the statement that the City would pay the railroad $50,000 was just giving his opinion. He did not check with the railroad company nor with the Legal Department of the City in an effort to determine what the City would have to pay, although it was his general understanding that any agreement would have to be made by the City Council and approved by the City's Legal Department. He testified that he knew there was a law suit filed and pending between the railroad and the City, and that nobody knew what was going to be paid, whether it would be $1,000,000, $3,000,000, or nothing. When asked, "What did you expect at the time you signed the contract you would make out of the railroad?" he testified, "Well it was hard to say, we knew approximately the cost of the new construction, we anticipated probably the City would pay at least 40% of it. That would be $4,000,000.00 roughly total, we had estimated it would be $1,600,-000.00." He figured that the City would pay $1,600,000 as its part, on which he would get 5%, but that was just his opinion. He testified that when he was advised that the City had paid some $1,500,000 to the railroad he was not surprised. He found out sometime in 1952 or 1953 for certain how much the railroad had actually been paid. He further testified that he did not know what fee, if any, that he would get until such time as he knew what agreement the City would make with the railroad, and that it was up to the City to make agreements with the railroad.

The evidence showed that appellees' final estimate dated November 26, 1954, in the sum of $39,638.92, which was marked "final", was received by the City on November 29, 1954, and was returned to appellees by the City which refused to pay it. In this final estimate appellees asserted no claim for any compensation in connection with the railroad. On January 13, 1956, appellees sent an estimate or bill to the City Council together with a pamphlet including their contentions. This was the first time that any claim was made for a fee for engineering services in connection with the railroad. Thus, from December 17, 1951, until

January 13, 1956, appellees never advised appellant that they claimed any compensation for engineering services relating to the railroad properties, nor did they offer to perform any such services. Smith testified, however, that he knew a long time prior to the time he made the so-called final estimate under date of November 29, 1954, what the City had paid the railroad, and that at the time he sent in such final estimate he thought the railroad bridge was not a part of their fee. Over a year after the City returned the final estimate and refused to pay it, Smith sent in the statement of January 13, 1956 including compensation in connection with the railroad.

There can be no question that Smith knew from his numerous dealings with the City that it would be necessary to wait until the suit between the railroad and the City was tried or settled before anyone would know what the City would pay the railroad, and that it would also be necessary for the City Council to pass ordinances authorizing the execution of any contract or settlement before the same could be made. It will be noted also that on cross-examination Smith testified that he and his partner, Mr. Umber, had discussed their final estimate and decided they would not send a bill to the City because they had signed the waiver. He also testified in his deposition when asked concerning the waiver, "Well, there is a lot of things that came into a thing like that. Like I have said before, we wanted to keep the good will of the City and get along with them for the job was one of many that we have had with them, but I guess that the main reason that we did it was to allay any enmity that we might incur with Frank Baldwin." When asked why he did not put in a claim for compensation for the railroad in his final statement of November 29, 1954, he answered, "Because, just as I have told you in the last question you asked me, that I wanted to collect all that I could out of the City before I hit them full in the face with something that I knew was going to be controversial."

The evidence showed that the settlement between the City and the railroad was nego-tiated by Mr. Will Sears, head of the City's Legal Department at that time, and that such settlement was not entered into until the City had threatened a condemnation suit and had obtained from the receiver appointed by the United States District Court at St. Louis for the Missouri-Pacific Railroad, then in bankruptcy, permission to file suit in Harris County.

Although the jury found in answer to Special Issue No. 10 that Smith signed the waiver of December 17, 1951, relying on the alleged representation of Baldwin that the City would not pay the railroad more than $50,000, it found in answer to Special Issue No. 16 that he signed the letter "*only* because he had been led to believe by Baldwin * * * that unless he did sign, the firm of Howe and Wise would not be paid for services rendered prior to that date." (Emphasis ours.)

It will also be noted that the five-page final estimate of November 26, 1954, showed in detail all the work on which appellees claimed compensation, the total costs to the City and the amounts paid to appellees. After it was rejected and returned by the City, some one inserted and interlined in pencil "Supervision of Bridge Construction (Lake Houston)—$75,000.00," and changed in pencil the typewritten figures on the estimate, and also wrote in pencil, "at one time (Nov. '54) H & W sent final bill to City for $39,638.92 and would have settled for that payment, but City refused. This am't, of course, excluded R. R. payment which H & W had agreed to waive." This casual treatment of a claim allegedly over $75,000 at least suggests that such claim was an afterthought on the part of appellees which never would have been asserted except for the fact that their real claim, as they considered it, had been rejected.

Mr. Baldwin testified that he did not tell Smith that the City would in no event pay more than $50,000 to the railroad company for the removal and relocation of its track; he told him no value whatever. Further, he testified, the best information

he had at the time was Lockwood & Andrews' estimate that it would cost between $500,000 and $600,000.

We think the overwhelming weight and preponderance of the evidence shows (1) that Smith did not rely on the alleged representation of Baldwin, (2) that with the knowledge of the facts he testified to he had no right to rely on such statement, which he knew were merely an opinion at best, and (3) that he knew that it was not up to Baldwin to say what the City would ultimately pay to the railroad, and that at the time no one could tell what would be paid.

This Court is reluctant to disturb the findings of a jury when supported by some evidence of probative value. It is within our power and our duty, however, to do so when such findings are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, even though the record contains some evidence in support of the verdict. We must consider all of the evidence, both that which supports the verdict and that which militates against it. King v. King, 150 Tex. 662, 244 S.W.2d 660; Dyer v. Sterett, Tex.Civ.App., 248 S.W.2d 234; Rules 451, 453 and 455, T.R.C.P.; Art. 5, Sec. 6, Constitution of Texas, Vernon's Ann.St.

We have concluded that the finding of the jury to Special Issue No. 10 that Smith signed the waiver relying on Baldwin's alleged statement is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

In view of our holding with respect to the jury's finding to Special Issue No. 10, we consider it unnecessary to discuss the numerous other Points of error directed at the submission of the issues covering the matter of the railroad and the jury's answers thereto.

Appellant's Points Nos. 127, 128, 130 to 136 inclusive, 138, 140, 141, 143 to 148 inclusive, grouped together, have to do with appellees' claim for work not covered by the written contract consisting of acreage surveys on the ground that were made by appellees in order to determine for payment of the clearing contractor the exact number of acres that had been cleared.

To Special Issues 19 to 23, inclusive, the jury found that an acreage survey of each of the three clearing contracts was not within the scope of appellees' contract with the City; that Howe & Wise were instructed by the City of Houston to conduct an acreage survey of each of such clearing contracts; that F. N. Baldwin in instructing Howe & Wise to conduct an acreage survey was acting within the scope of his authority; that the City benefited by the figures derived from Howe & Wise's acreage survey; and that $13,601.70 would be a just and reasonable sum to compensate Howe & Wise for conducting such acreage survey.

By the above numbered Points of Error, appellant asserts that Special Issue No. 19 inquiring whether the acreage survey was within the scope of the contract involved a question of law. It also contends that the answers to Special Issues Nos. 19 to 23 are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

We are of the opinion that the Court did not err in submitting Special Issue No. 19 for the reasons hereinabove given in connection with the other issues complained of by appellant as being issues of law or issues of mixed law and fact.

Mr. Smith was asked whether his firm performed certain services not contemplated by the contract. He answered in the affirmative. Appellant objected after the answer was given, but did not ask that the Court instruct the jury not to consider such answer. He then testified that the services which he performed not contemplated by the contract were extra surveying. He further testified: "We were ordered by Mr. Baldwin to survey each of the three clearing contracts consisting roughly of 14,000 to 15,000 acres"; that

it was appellees' understanding of the contract that the surveying was definitely extra work; that at the beginning of the contract it was agreed that they would determine the acreage in each contract by the topography maps the City had for the purpose of determining the exact acreage in each contract; that it was necessary that the City have the exact acreage in such contracts for the purpose of paying the clearing contractor; that it was understood at the time that the survey was to be used to compute what was due the clearing contractor; that they (appellees) would expect a fair and reasonable pay for the surveying; that the City did not stop them until the surveying was nearly completed, and accepted the figures as furnished by them; and that their services were in conformity to good engineering practices. Appellees introduced Exhibit 49 which consisted of a letter addressed to Mr. Clyde Harvill, Superintendent, San Jacinto River Water Supply Project, in which, among other things, it was stated:

"It now seems that, contrary to our understanding with Mr. F. N. Baldwin at the time we signed our contract with the City of Houston, we are to be required to make a boundary survey of all the lands within the forty-five (45') foot contour without any compensation therefore. It is our contention that we were to make computations for final payment on the clearing contracts from the topographic maps completed by our firm for the City several years ago and from other available and reliable data. In the preparation of the specifications for the clearing of the Reservoir we stated in the original drafts that payment would be made on such a basis. We were requested by the City to change this section to read that final payment would be made on the basis of an actual survey. It was generally understood however that we would be paid on a per diem for making such a survey and an estimate of cost was prepared which indicated approximate-ly eighty (80) field party days and about forty (40) office days. I wish to say here however that we are going forward with this work without delay but we wish to take this means of putting the City on notice that we shall expect payment as originally understood."

There was evidence that the value of the surveying, $13,601.70, was just and reasonable. Mr. Smith also testified that the surveying work his firm did was specific work requested by the City by Mr. Baldwin. After appellees had finished making the survey on the ground of Sections 1 and 3 they were stopped by Mr. Baldwin before finishing Section 2.

On cross-examination Smith testified in effect that it was part of the Engineer's duties to certify that so many acres had been cleared and the amount the clearing contractor was entitled to on such acreage, but that the contract did not specify that Howe & Wise were to make the survey on the ground; that the specifications called for a survey to be made, and that appellees hoped they would get the job to do it. He further testified that they agreed to do the perimeter work and survey the clearing contracts and agreed to certify the actual *payment to it*, on the measurements of the topography maps; that he had told Mr. Baldwin that he wanted to determine the final area by instruments, using the topography maps, and that Mr. Baldwin told him, "Unless you measure that as specified, how can you certify they have cleared so much?" and that he (Smith) said, "That is right", and he went ahead and started surveying on the ground after everything was cleared; that after completing Contracts Nos. 1 and 3, but before completing No. 2, a controversy arose between the clearing contractor, Smith, and Baldwin because No. 2 didn't close, or for some other reason, and it was then agreed the acreage would be determined by planimeter measurements of the topography maps which appellees helped to make, in all 77 sheets.

Smith testified on redirect examination that the contract did not call for an acreage survey, that he put in the clearing specifications a requirement for an acreage survey because he was instructed by Baldwin to do so; that he made an acreage survey because ordered by the City to make it; and that such acreage survey was used as a basis of comparison in making payments to the clearing contractor.

Mr. Baldwin testified that appellees did the surveying on the clearing and prepared specifications appropriate to the taking of bids for the clearing work; that appellees' contract required that in the regular performance of their duties they make a measurement on the ground before agreeing to the number of acres actually cleared; that a perimeter was made to determine approximately the number of acres for taking bids but that later the acreage would have to be determined by an actual boundary survey on the ground; that topography maps were not used to make final payments unless the specifications given the clearing contractor so stipulated; that when it came time to complete Contract No. 1, Smith asked, "Why don't we take those areas you furnished us to start with?" and that he, Baldwin, replied that they would have to issue a certificate to the exact amount of acreage before the City could pay the contractor, whereupon Smith said that they would have to measure it, and proceeded to do so; that Smith never mentioned that he would want extra pay until about the end of the third contract.

The testimony of appellant's engineer, Mr. Lockwood, was to the effect that from reading the contract there was good reason to believe the work would be done and the clearing contractor paid on an acreage basis and that the responsibility was on the consulting engineer to in some way measure the final quantity; that he had known of topography maps having been used to estimate acreage and payments made on that basis; that from his knowledge of the contract in question it was not specified that the consulting engineer would make an acreage survey on the ground; that in his opinion under the language of the contract in question, it was contemplated a survey would be made on the ground with surveying instruments after the clearing had been completed in order to certify how many acres were cleared on which final payments were to be made; and that he was of a strong conviction that taking both the contract and the bid proposals into account, it was contemplated "that this work not be paid for separately but be included in the 5% fee when referring to the survey for final payment."

Although the evidence consists largely of opinions and is not strong either way as to whether the ground survey was to be paid for as extra work, there is evidence of probative force that the City by said letter to Harvill, sent prior to the making of the survey, had notice that appellees were expecting compensation for the extra surveying, and that Baldwin directed Smith to make the ground survey and did not stop him until the survey was practically completed; and further that the City used the survey as a comparison in paying the clearing contractor, and thus accepted benefits as the result of the alleged extra work. Since the extra surveying work did not come within the terms of the contract, the provisions of the contract with respect to the filing of estimates and certificates do not apply.

The City, having knowingly accepted appellees' work and having been benefited thereby, has ratified the action of its Director of Utilities in directing that the survey be made on the ground, and is liable on the implied contract for the reasonable value of the services rendered. We have concluded that we cannot say that the findings of the jury to the Issues covering the extra work are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Although an agent of a municipal corporation cannot bind the city on a

contract, oral or written, which does not comply with statutory requirements governing valid municipal contracts, the city may become liable on an implied contract to pay the reasonable value of services rendered when it accepts the benefits of such services and of the contract made by its employee.

In City of Houston v. Finn, 139 Tex. 111, 161 S.W.2d 776, 777, our Supreme Court stated:

"It is settled law in this State, as established by the decisions of this Court, that where a municipality knowingly received property or services on an agreement which it had power to enter into as a contract, but which was not legally entered into so as to make it binding as a contract, it will be compelled to pay the reasonable value of the property or services so received, as on an implied contract."

■ By their Cross-Point of Error One, appellees assert that the Trial Court erred in failing to enter judgment for reasonable attorney's fees under Article 2226, Vernon's Ann.Tex.Civ.St., as found by the jury. They contend that the present case is distinguishable from the case of City of Houston v. Fuller, Tex.Civ.App., 311 S.W.2d 285, in which this Court held that attorney's fees could not be recovered against a city under Article 2226, V.A.T.S.; the distinction being that the City was acting in a governmental capacity in the Fuller case, whereas in this case the City was acting in a proprietary capacity.

We recognize, of course, that a city may be held liable in tort where the cause of action arose from certain acts performed by it while acting in a proprietary capacity, whereas if acting in a governmental capacity there would be no liability. We also agree with appellees that in the Fuller case the City was engaged in building a sanitary sewer and hence was acting in a governmental capacity, whereas in constructing Lake Houston it was acting in a propri-etary capacity. The decision in the Fuller case, however, is not based upon such distinction, but upon the premise that Article 2226 does not include a public corporation such as the City of Houston in the absence of some provision of an act evidencing an intention to include public corporations. As stated by the Supreme Court in State v. Central Power & Light Co., 139 Tex. 51, 161 S.W.2d 766, 768,

"While there are exceptions, depending on the peculiar wording of the statute under consideration, as a general rule the word 'corporation' is construed to apply only to private corporations and does not include municipal corporations, unless the statute expressly so provides. 30 Tex.Jur. 14; City of Tyler v. Texas Employers' Ins. Ass'n, Tex.Com.App., 288 S.W. 409; Id., Tex.Com.App., 294 S.W. 195; City of Dallas v. Halford, Tex.Civ. App., 210 S.W. 725, writ refused; Wilcox v. City of Idaho Falls, D.C., 23 F.Supp. 626; City of Webster Groves v. Smith, 340 Mo. 798, 102 S.W. 2d 618. See 9 Words and Phrases, [corporation] p. 712 et seq."

We therefore overrule appellees' Cross-Point One.

■ Although the entire cause of action asserted by appellees grows out of or is incident to their contract with appellant, we are of the opinion that their claim for compensation for alleged services in connection with the railroad, which they claim they were wrongfully prevented by the City from performing, is severable from their claim for compensation for services consisting of the acreage survey and also from their claim for compensation allegedly owing them for services on the pipelines which they rendered or were prevented from rendering, and from their claim for an alleged balance due them on the clearing contracts. The claim incident to the railroad, though referable to the contract, involves issues not pertinent in any way to the other claims and not dependent there-

on or affected thereby. Such claim may be tried independently of and without regard to the other claims. We have concluded, therefore, that the judgment of the Trial Court as concerns the recovery in connection with the railroad may be reversed and remanded without reversing the judgment as to the other claims and recovery thereon.

Rule 434, T.R.C.P.; Tillman v. Mahaffey, Tex.Civ.App., 252 S.W.2d 255, ref., n. r. e.; Page v. Hancock, Tex.Civ.App., 200 S.W.2d 421, ref., n. r. e.; Marshall v. City of San Antonio, Tex.Civ.App., 63 S. W. 138. In Durham v. Scrivener, Tex. Com.App., 270 S.W. 161, 163, the Court stated:

"We also think the issue as to what damages or recovery should be awarded for the wrongful conveyance of a portion of such land is severable from the issue as to what the recovery should be as to wrongful conveyance as to other portions to different parties.

"After a fair and impartial trial has been had in the trial court on the issue involving the cancellation of the deeds, it would indeed be unfortunate if the rules of procedure governing appellate courts were such that, without any apparent reason therefor, the trial court should again be required to determine this issue." Miller v. L. Wolff Mfg. Co., Tex.Civ.App., 225 S. W. 212.

That part of the judgment in the sum of $35,653.52 representing the aggregate of the amounts awarded appellees by the Trial Court for services rendered or which they were prevented from rendering in connection with the pipelines, extra surveying and balance owing on the clearing contracts, is affirmed, and the remainder of the judgment, being the amount of $74,973.50 awarded in connection with the railroad is reversed and remanded. Costs of the appeal and in the Trial Court to date are adjudged equally between appellant and appellees.

Affirmed in part; reversed and remanded in part.