Noah MAIZEL, d/b/a Texas Waste Salvage
Co., Appellant,

v.

J. E. BUSH, d/b/a Texas Automatic
Sprinkler Co., Appellee.

No. 15597.

Court of Civil Appeals of Texas.

Dallas.

July 1, 1960.

Rehearing Denied July 22, 1960.

Sanders, Lefkowitz & Green, and Jack D. Eades, Dallas, for appellant.

Harless & Bailey, Dallas, for appellee.

DIXON, Chief Justice.

Our former opinion in this appeal is withdrawn and the following opinion is substituted.

Appellee J. E. Bush, doing business as Texas Automatic Sprinkler Company, sued appellant Noah Maizel, doing business as Texas Waste Salvage Company, seeking judgment for the contract price of $6,134 alleged to be due and unpaid for the installation of a sprinkler system in appellant's place of business in San Antonio, Texas.

Appellant defended on the ground that appellee had not finished the job in accordance with the terms of the contract, and as a result it had been necessary to employ another company at a cost to appellant of $2,690 to do additional work in order to complete the job, and to expend the sum of $962 in increased insurance premiums.

The case was tried before a jury which answered issues adversely to appellant.

Judgment was accordingly rendered for appellee and against appellant for $6,134, plus $613.40 attorney's fees, a total of $6,747.40. The judgment provided for interest at the rate of 6% per annum from January 1, 1956.

The facts in this case are unusual and at times confusing.

Appellee had begun work in connection with the installation of the sprinkler system in November 1954, before the written contract was signed on January 27, 1955.

The premises where the sprinkler system was to be installed are described in the written contract as a "one story building having approximate dimensions of 30' x 28', 32' x 66', 32' x 40', 68' x 156', and 140' x 150'." The testimony of the witnesses for both sides refers to several buildings. Apparently there were several buildings involved, as the above dimensions suggest, but they were connected in such a way that in a sense they might be considered one building. Not all of the buildings or sections had been erected when appellee began his work in November 1954, or when the written contract was signed January 27, 1955. Appellant and appellee had conferred and thereafter appellee prepared a set of plans and later a second set of plans. According to appellee these two sets of plans supplement each other and taken together make a complete set of plans for the installation of the sprinkler system.

The plans prepared by appellee were not submitted to appellant for approval. They are not attached to, or referred to in the written contract. Appellant testified, and the testimony is undisputed, that the first time he ever saw the plans was at the trial of this case in October 1958.

The two sets of plans were sent to the Fire Prevention and Engineering Bureau of Texas for approval, and were approved by the Bureau on January 17, 1955 and April 29, 1955, respectively. The Bureau is an organization maintained by approximately 200 stock fire insurance companies

to render engineering service in connection with the fire insurance business.

The written contract provides that after installation the sprinkler system shall be "subject to inspection by Fire Prevention & Engineering Bureau of Texas, acting as the Agent of both parties, whose inspection and approval of the work done hereunder by the Seller shall be conclusive evidence of the proper performance and completion of the Seller's obligation hereunder."

The approval of the plans by the Bureau is not to be interpreted as meaning that the plans were necessarily in accordance with the written contract. Henly H. Davis, Assistant Chief Engineer of the Bureau, testified that the Bureau does not undertake to see that sprinkler systems are installed according to terms of contracts. Its duty is to see that sprinkler systems are put in according with requirements of National Board standards of fire prevention. In this case the Bureau did not even see the contract and had no knowledge of its contents whatever.

Henly H. Davis also testified that approval of plans by the Bureau does not necessarily mean that the Bureau will later approve the system as actually installed, though it may have been installed according to the approved plans. This occurs sometimes because the Bureau does not make a physical inspection of the premises in question before approving the plans. The plans may show a satisfactory sprinkler service of wall to wall areas and ceiling areas, but fail to show particular areas needing sprinkler service, such, for instance, as an area underneath heavy machinery. This situation may not be disclosed by the plans, but will be discovered when the Bureau inspector visits the premises after a sprinkler system is installed, and goes all over the areas regardless of whether they are shown on the plans. The present case presents such an instance.

We think the undisputed testimony of Davis in this particular is of sufficient importance to be quoted:

"Q. Now, it is possible that those plans might not show some machines or some equipment or some eaves that are actually down there and if they do it just like the plans say will not pass your inspection, is that correct? A. That is correct.

"Q. And that is exactly what happened, here, isn't it? A. Apparently so. * * *

"Q. If there had been shown to have been some hammermills and conveyor belts and so forth on that first plan, you would have had to require some additional sprinklers before you approved that first plan, would you not? A. That's right. We would not have stamped those approvals; if they were not on the plans.

"Q. And you don't know who submitted those or who put them on, or who left them off? A. I know they were submitted to us by the Texas Automatic Sprinkler Company; by whom personally, I do not know.

"Q. In other words, the sprinkler company gave them to you and they didn't show any machinery in the floor? A. That's right.

"Q. And substantially the defects you found on your physical inspection, was that they had omitted putting the sprinklers underneath this machinery, is that correct? A. The machinery and that one room; you can refer to it as machinery or construction areas."

Appellee says that he completed performance of the contract in July 1955. He demanded payment, and following appellant's refusal to pay, appellee filed this suit October 5, 1955.

The suit was filed before the Fire Prevention and Engineering Bureau had made its inspection of the sprinkler system installed by appellee. The actual physical inspection was not made until June 27, 1956. The System was not approved in full.

Certain deficiencies were pointed out in the Bureau's letter to appellee dated June 28, 1956. We quote from the letter:

"The following deficiencies were noted at the time of inspection and will have to be corrected before final approval for the protection afforded can be issued. 1. There is a 12 x 40-foot frame metal-clad room which has been erected inside of the Baling Section which will have to be sprinklered.

"2. There is a 12 x 13-foot metal hopper which should have sprinklers installed beneath it unless it is dismantled and removed as the owners indicated would be done.

"3. The Hammer Mill for crushing cardboard is approximately 20 x 20-feet in size and will require sprinklers.

"4. There are three conveyors (belt type), 5-feet wide and approximately 40-feet long which will require sprinklers beneath each conveyor.

"5. The baling machines will require at least one head and possibly two or three heads beneath them.

"6. One head will be required beneath the eave of the building section of the Main Building and the Boiler Room since the addition of the Boiler Room adjacent caused an enclosed area which is being used for storage.

"7. One head will be required beneath the metal stair platform at the second story level of the Office and the Baling Room Section, as this area is also being used for storage."

The last paragraph in the Bureau's letter was as follows:

"The equipment which was installed was according to plans and meets National Board standard requirements for the areas covered."

Appellant relies on this last paragraph as proof that he had completed the job according to contract, and contends that it is conclusive evidence of proper performance and completion of his obligation under the contract, as the contract itself expressly provides.

After a study of the letter as a whole we are unable to agree with appellee. What the last paragraph means is that the installation was all right as far as it went, but the letter as a whole plainly indicates that the system was incomplete because it did not cover certain areas. And our view finds support in the testimony of Henly H. Davis, who wrote the letter. We again quote:

"Q. Now, Mr. Davis, going further, you said that the plans were approved. *Now, upon the field inspection was final approval given to the whole premises or not on Flores Street? A. Final approval to the whole premises?*

"Q. Yes, sir. A. No, sir.

"Q. All right, why was it not given? *A. Because our field engineer reported that certain areas that he found at the time he made the inspection that were not covered by sprinkler protection, therefore, we could not approve the sprinkler protection for the plans as a whole.*

"Q. Now, in other words, you found areas that weren't on the plans? A. That is correct.

"Q. All right, now, did your office approve of the system that was installed insofar as shown by the plans as far as standards, engineering and so forth? A. It was; it was installed according to the plans for the areas which were covered, yes, sir.

"Q. Was it installed up to a good engineering standard and so forth? A. Yes, sir." (Emphasis ours.)

Appellee did not correct the deficiencies pointed out in the Bureau's letter of June 28, 1956. Appellant later entered into a separate contract with another company,

W. H. LaDew, Inc., for a consideration of $2,690 for additional work. Some of this additional work was in another building not involved in appellee's contract, but some of it was in the building described in appellee's contract and consisted of correcting the deficiencies listed in the Bureau's letter.

Final approval by the Bureau of appellant's entire automatic sprinkler system did not come until April, 25, 1958 after the LaDew Company had completed performance of its contract with appellant, which contract included the correction of the deficiencies mentioned in the Bureau's letter of June 28, 1956.

■ In his first point on appeal appellant asserts that the trial court erred in overruling his motion for judgment non obstante veredicto in the amount of $3,652 as an offset against appellee's claim of $6,134, the contract price. This offset of $3,652, according to appellant, is the sum of $2,690, the additional consideration paid to LaDew, and $962 in increased insurance premiums appellant had to pay on account of the deficiencies in the sprinkler system.

We are unable to agree with appellant. The $2,690 paid to the LaDew Company, as we have already pointed out, did include the correcting of the deficiencies in the building described in appellee's contract, but, it included also the cost of installing a sprinkler in a new, separate building not included in and no way connected with appellee's contract. We find no testimony in the record showing what part of the $2,690 should be considered the cost of correcting the deficiences in the system installed by appellee.

Appellant relies on Atkinson v. Jackson Bros., Tex.Com.App., 270 S.W. 848, 38 A.L.R. 1377, in which it is held that where there is a substantial, but not a complete performance of a contract, the contractor cannot recover the full contract price, but must allow deductions necessary to remedy the defects and omissions; and the burden is on the contractor to furnish the evidence

properly to measure the deductions necessary to correct the defects. However we point out that in the Atkinson appeal judgment was not rendered for appellant, as appellant in this case asks us to do. The cause in the Atkinson appeal was remanded for another trial. Appellant's first point is overruled.

■ In his second point on appeal appellant complains of the admission in evidence of the testimony of L. E. Ellzey concerning prior and contemporary expressions, negotiations, transactions and discussions relating to the execution and the terms of the written contract. Ellzey was appellee's manager who negotiated the contract and who had charge of the installation of the sprinkler system.

Neither appellant nor appellee pled ambiguity in the terms of the contract. Each at times during the trial asserted that the contract was clear in its terms. But their positions were not consistent with such assertions. For each side offered testimony on the question whether the contract obligated appellee to place sprinklers under heavy machinery and equipment. The contract itself is silent on the subject. It is undisputed that appellee did not place sprinklers under heavy machinery and equipment.

To set out all the testimony to which appellant objected would be to prolong this opinion unreasonably. In our opinion the testimony does not amount to an attempt to vary the terms of the written instrument. The peculiar circumstances of this case required a statement of the background facts leading up to the signing of the contract if the controversy is to be understood. The challenged testimony seems to us in the main to delineate these background facts.

■ But if we are mistaken in the above conclusion, we must still overrule appellant's points for the reason that appellant is not in position to complain. When appellant Maizel was on the witness stand and objection was made to some of his testi-

mony, his attorney in open court made this statement:

"I am saying that the contract is not clear as to whether sprinkling the building by those dimensions intended to sprinkler—to include sprinkler heads underneath the machinery; in other words, it is explaining an apparent discrepancy in the contract, and also explaining the intention of the parties as to exactly what was to be furnished under this contract."

Appellant will not be heard to complain of appellee's testimony explaining the meaning of the contract, then urge admissibility of his own testimony on the ground that the contract is not clear and needed explaining as to the intention of the parties. Apparently the parties tried the case on the theory that the contract was not clear in its meaning and, despite the lack of a pleading of ambiguity, the judgment will not be reversed on the ground urged by appellant in his second point. Rule 67, Texas Rules of Civil Procedure. Appellant's second point is overruled.

In his third to sixth points inclusive, appellant says that the findings of the jury in answer to special issues are without support in the evidence and are against the overwhelming weight of the evidence.

■ The jury's answers were (1) appellee installed a dry pipe system of automatic sprinklers throughout the buildings 30' x 28', 32' x 40', 40' x 150', 32' x 66', and 68' x 156'; (2) the Fire Prevention and Engineering Bureau of Texas approved the system of automatic sprinklers installed by appellee; (3) appellant Noah Maizel did not incur additional expense to complete the system installed by appellee; and (4) appellant was not required to pay additional insurance premiums by reason of appellee's failure to complete the system of sprinklers.

We agree with appellant that the evidence is insufficient to support the answers of the jury, and said answers are contrary to the overwhelming weight of the evidence.

This controversy, as we have indicated, in the main revolves around the question whether appellee was obligated under his contract to place sprinklers underneath the hammer mill, the bailers and other machines. The written contract, though silent as to the specific question, does contain this express provision:

"7. The conditions and covenants hereof shall apply to any repairs, replacements, extensions or alterations to the system hereafter at any time made by the Seller, and the Seller shall be under no greater liability therefor than is imposed upon it herein with respect to the original installation."

Moreover, appellee in effect admitted through his manager L. E. Ellzey that when the contract was signed it was contemplated and he knew that he would have to put sprinkler heads under the heavy machinery. His testimony on this point was admitted without objection.

"Q. Now, also at the time that his old place was sprinkled, had sprinklers installed, you had to put sprinklers underneath that heavy machinery, didn't you? A. That is correct, yes, sir.

"Q. *So that at the time this contract was signed, you had reason to believe that the same business was going in there and that you would have to put sprinkler heads under the heavy machinery? A. I sure did, yes, sir.*" (Emphasis ours.)

Also, we think that the undisputed testimony, already quoted, of Henly H. Davis, the Assistant Chief Engineer of the Bureau, shows without doubt that though the Bureau approved appellee's installation as far as it went, the Bureau withheld complete approval of the entire system installed by appellee because it did not include all the areas in the building where sprinklers

were required, namely, underneath the heavy machinery and equipment.

Appellant's third through sixth points are sustained.

In his seventh point appellant says that the court erred in allowing interest from January 1, 1956. Appellant's view is that interest should be computed from April 25, 1958 when the Bureau gave its final approval to the sprinkler system in the premises described in appellee's contract.

Since appellee's suit was based on his alleged full performance of the written contract, we think Art. 5070, Vernon's Ann.Civ. St., is applicable to his cause of action. The contract itself provides for the approval of the job by the Bureau. Thus if appellee should recover in full under the contract, interest would not begin to run until payment became due on the date of the approval by the Bureau, which date was April 25, 1958.

On the other hand if appellant establishes his unliquidated claim of offset on account of deductions for cost of completing the job, we think the question of interest will be a fact question for the jury. St. Louis Southwestern Ry. Co. of Texas v. Seale & Jones, Tex.Com.App., 267 S.W. 676 (Syl. 3); South Chester Tube Co. v. Texhoma Oil & Refining Co., Tex.Civ.App., 264 S.W. 108 (Syl. 4); 13 Tex.Jur. (Rev.) 267; 25 C.J.S. Damages § 52, pp. 538–539.

Appellant's seventh point is sustained.

The judgment is reversed and the cause is remanded to the trial court for another trial.

CRAMER, J., not sitting.