Dr. Jon D. HALL, Dr. Noel W. Cowan, By and Through Pansy Cowan, Executrix, Dr. Betty A. Lowe, and Texarkana Memorial Hospital, d/b/a/ Wadley Hospital, Appellants,

v.

Phillip J. BIRCHFIELD and Mary Jo Birchfield, Individually and as Next Friend for Kellie Lee Birchfield, a Minor, Appellees.

No. 9346.

Court of Appeals of Texas, Texarkana.

June 17, 1986.

On Rehearing Aug. 26, 1986.

Rehearing Denied Sept. 23, 1986.

John D. Raffaelli, Raffaelli & Hawkins, Victor Hlavinka, Atchley, Russell, Waldrop & Hlavinka, Texarkana, W.A. Eldredge, Jr., Little Rock, Ark., for appellants.

Paul N. Gold, Law Offices of Frank L. Branson, P.C., J. Hadley Edgar, Dallas, for appellees.

Before CORNELIUS, C.J., and GRANT and CHADICK *, JJ.

GRANT, Justice.

Dr. Jon D. Hall, Dr. Noel W. Cowan (by and through Pansy Cowan, executrix), Dr. Betty A. Lowe, and Texarkana Memorial Hospital, Inc., d/b/a Wadley Hospital, appeal a judgment of $3,311,500.00 based upon a jury verdict. The case involved alleged medical malpractice concerning retrolental fibroplasia (RLF) in a newborn infant.

Kellie Birchfield was born on August 14, 1974, at Wadley Hospital in Texarkana to parents, Phillip J. Birchfield and Mary Jo Birchfield. The infant was two to three months premature and weighed two pounds, seven ounces. She was born with a congenitally small and functionless right eye. She was treated in the hospital nur-

* Honorable T.C. Chadick, Justice, Supreme Court of Texas, Retired, sitting by Assignment.

sery from the date of her birth until her discharge on November 14, 1974. Shortly afterwards, she was seen by an ophthalmologist, who diagnosed a RLF condition in her left eye. The condition has caused total loss of sight in her left eye. Scientific studies dating from the 1940's and 1950's suggest that a causal relationship exists between the administration of high levels of oxygen to premature infants and the occurrence of RLF.

Counsel for both the appellants and the appellees have submitted excellent briefs. The physicians and hospital raise 110 points of error on appeal. The Birchfields have cross-appealed raising four points of error.

■ The hospital and physicians complain of the appointment of a guardian ad litem for the minor and the taxing of the cost of the guardian ad litem against the hospital and physicians jointly and severally. Tex.R.Civ.P. 173 provides that a guardian ad litem shall be appointed for a minor child who is represented by next friend where the next friend appears to the court to have an interest adverse to the minor. The determination of the existence of a conflict of interest requires exercise of judicial discretion. *Gibson v. Blanton*, 483 S.W.2d 372 (Tex.Civ.App.—Houston [1st Dist.] 1972, no writ). An erroneous appointment of a guardian ad litem does not call for reversal unless it is shown to have prejudiced the jury. *Saad v. National Child Care Center, Inc.*, 612 S.W.2d 660 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). Caution should dictate the displacement in every legal proceeding in which the pleading or the evidence indicates a reasonable possibility of adverse interest. *Newman v. King*, 433 S.W.2d 420 (Tex.1968). While some situations require such an appointment, others are within the discretion of the judge. When the natural parents are parties to the suit, a judge may exercise his judicial discretion if he believes that such a potential conflict exists and could arise during a negotiation of settlement or prosecution of the suit, and such costs can be taxed against the defendants. *Coleman v. Donaho*, 559

S.W.2d 860 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ dism'd). We find that the trial court did not abuse its discretion in appointing the guardian ad litem for the minor.

■ The hospital and physicians complain that their counsel was not allowed to conduct voir dire examinations of the jury panel regarding acquaintance of prospective jurors with attorney Errol Friedman and by instructing the jury that attorneys Errol Friedman and Jim Hooper were not connected with the parties to the case as far as the court knew. The record indicates that Friedman and Hooper were the referring attorneys and assisted in getting information about jurors. It is not clear why the trial judge so instructed the jury on the involvement of these lawyers. However, he determined those on the panel who knew them.

The trial court conducted voir dire on Friedman and Hooper as follows:

THE COURT: Fine. Thank you. Does anyone know Mr. Errol Friedman or Mr. Jim Hooper or Mr. Michael Friedman or Mr. Donald Friedman? They have no connection that I know of with this case, but I'm going into about anybody that I think may have rubbed elbows with it. Anybody over here? Yes, sir, Reverend Cooper?

JUROR NAPOLEON COOPER: I used to chauffeur he and the Dillard boy.

THE COURT: Used to chauffeur who?

JUROR NAPOLEON COOPER: He and the oldest Dillard boy.

THE COURT: Well, is there anything about that—Mr. Friedman has no connection with the case that I know anything—I just want to know what you know about him. Don't tell us everything. Just ...

JUROR NAPOLEON COOPER: We used to ride around and eat ice cream together.

THE COURT: Well, would that have any bearing on this case?

JUROR NAPOLEON COOPER: No.

THE COURT: Fine. Anybody else? Yes, ma'am?

JUROR PAULA COLORIGH: Mr. Jim Hooper has been a lifelong friend of mine, and Mr. Hooper and Mr. Friedman represented my niece.

THE COURT: All right, thank you.

. . . .

THE COURT: That's Mrs. Colorigh.

JUROR: Mr. Friedman represented my brother in a recent divorce case.

THE COURT: And that's it?

JUROR: Yes.

THE COURT: Thank you. Anyone else want to talk about Mr. Friedman?

JUROR RICHARD MARTINDALE: Jim Hooper, I have known . . .

THE COURT: State your name.

JUROR RICHARD MARTINDALE: Richard Martindale. I've known Jim Hooper all of my life.

THE COURT: All right. Well, Mr. Hooper is not over here. He has no connection with this case. I just wanted to know what you know about him, but I'm glad you didn't tell us any more.

JUROR BOBBIE AUTREY: Mike and Don Friedman . . .

THE COURT: State your name to the reporter, please.

JUROR BOBBIE AUTREY: I'm sorry. Bobbie Autrey. (Inaudible.)

THE COURT: The reporter said she could not hear you.

JUROR BOBBIE AUTREY: Mike and Don Friedman are customers in the bank where I work.

THE COURT: Okay, thank you. Anybody over on this side? Yes, ma'am?

JUROR LINDA THRAPP: Number two hundred, Thrapp. Jim Hooper fixed a will for my husband and I about fifteen years ago.

THE COURT: Thank you. Anyone else?

The court did not determine whether these acquaintances with the attorneys would influence the potential jurors, apparently on the basis that they could not be influenced because they would not be aware of the involvement of these two attorneys. However, one of the jurors, Richard Martindale, became aware of their involvement through communications with his father and, as he stated in his affidavit, "After a few days of seeing Errol Friedman or Jim Hooper come to the courthouse, I then realized they must be involved in the lawsuit in one way or another."

To constitute reversible error, the appellants must show that as a result of the trial court's action, they were required to take an objectionable person on the jury, and there is nothing in the record to indicate that any remaining juror was biased, prejudiced or disqualified to sit as a juror. *Daggett v. McReynolds,* 459 S.W.2d 475 (Tex. Civ.App.—Houston [14th Dist.] 1970, no writ).

The hospital and physicians complain of jury misconduct on the basis of three incidents that occurred during the course of the trial.

■ The first incident involved contact with juror Martindale's father. Attorneys Friedman and Hooper visited him at his place of employment. They briefly informed Martindale's father that his son was on jury duty and something of the nature of the case. They then asked his father if he felt that his son could be fair. His father informed them that his son would stick by his beliefs and would not be persuaded otherwise.

Richard Martindale was one of the two jurors who voted against the Birchfields' position in the case, and therefore, the contact with the family member, although not ethical, could not be considered harmful.

Another contact occurred when William Anderson, an employee of the attorneys for the Birchfields, was in the restroom. According to Anderson, a juror whom he could not identify asked him about the Lakers' basketball game. He replied that he hated to see the Lakers lose a game, and that ended the conversation.

The third contact involved a conversation between juror McPherson's daughter and attorney Errol Friedman. The daughter

was a waitress, and Friedman, while he was at the establishment where she worked, mentioned to her that her father was on the jury. According to Friedman's testimony, that was the extent of the conversation.

■ The one complaining about jury misconduct has the burden to prove the overt act of misconduct, that it was material misconduct, and from the record as a whole that injury probably resulted. *Fountain v. Ferguson,* 441 S.W.2d 506, 507 (Tex.1969). We find that the conduct was not material and, from the record as a whole, that injury probably did not result.

The hospital and physicians complain that the trial court erred by admitting opinions of the witnesses as to negligence, heedless and reckless conduct, gross negligence and proximate cause.

■ Tex.R.Evid. 704 permits testimony in the form of an opinion or inference otherwise admissible even though it embraces an ultimate issue to be decided by the trier of fact. This rule did not change the existing state of evidence law in Texas. Prior to codification of the Texas Rules of Evidence, Texas did not exclude opinions on the basis that they embraced an ultimate issue or invaded the province of the jury. *Carr v. Radkey,* 393 S.W.2d 806 (Tex.1965); Norvell, *Invasion of the Province of the Jury,* 31 Texas L.Rev. 731 (1953). However, the new rule did not open the door to matters which contain opinions as to points of law or questions of mixed fact and law. What constitutes negligence or malpractice on the part of a physician is a mixed question of law and fact that can only be determined by the trier of fact on basis of evidence admitted and instructions given by the court. A medical expert is not competent to express an opinion on what constitutes negligence or malpractice on the part of a physician. *Snow v. Bond,* 438 S.W.2d 549 (Tex.1969). An expert witness can give information about standards of medical practice but should not express an opinion as to the conduct that might be expected of a hypothetical doctor similarly situated. *Snow v. Bond, supra.* Proxi-

mate cause is subject to the same rule as a mixed question of law and fact. *Bronwell v. Williams,* 597 S.W.2d 542 (Tex.Civ.App. —Amarillo 1980, writ ref'd n.r.e.).

The attorneys for the Birchfields cite *Faulkner v. Thrapp,* 616 S.W.2d 344 (Tex. Civ.App.—Texarkana 1981, writ ref'd n.r. e.), for the proposition that legal opinions are admissible if the evidence would be helpful to the jury. It should be pointed out that the concurring opinion became the majority opinion on this point, because Chief Justice Cornelius, although concurring in the results, disagreed with the admissibility of the legal opinion, and Justice Hutchinson concurred with Chief Justice Cornelius.

Chief Justice Cornelius said in expressing the majority view:

It is well settled that a witness, regardless of his training, is not permitted to give an opinion which constitutes a legal conclusion. *Brown v. Mitchell,* 88 Tex. 350, 31 S.W. 621, 36 L.R.A. (sic) 64 (1895); 2 R. Ray, Texas Evidence § 1423, p. 71 (3d ed. 1980), and cases cites; 7 J. Wigmore, Evidence § 1952, p. 81 (3d ed. 1940); 23 Tex.Jur.2d Evidence § 413, p. 619, and cases there cited. The basis for that rule is not that the witness lacks the training or competence in the law necessary to understand and apply the legal definition or test. The reason for the rule is that the legal effect of a given set of facts is not a matter for the opinions of witnesses, but is a matter of law which is to be decided and applied solely by the tribunal trying the case. 2 R. Ray, Texas Evidence § 1423, pp. 71–72 (3d ed. 1980), and cases there cited; 7 J. Wigmore, Evidence § 1952, p. 82 (3d ed. 1940). In the case of a mixed question of law and fact, such as testamentary capacity, to permit a witness to state his conclusion would allow that witness to interpret and apply for the jury the legal test involved in the question, which is properly the exclusive prerogative of the judge.

In the case of *Lee v. Andrews,* 545 S.W.2d 238 (Tex.Civ.App.—Amarillo 1976, writ dism'd), the court found that an erroneous evidentary ruling in a medical malpractice case allowed testimony by the doctor which tended to declare directly that the defendant's conduct constituted negligence. However, the court found that this was not calculated to cause, and probably did not cause, rendition of a verdict different from the one rendered; therefore, the error was harmless. In the case of *Garza v. Berlanga,* 598 S.W.2d 377 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.), the court said it was error in a medical malpractice action for plaintiff's counsel to use the words "proximate cause" in a question posed to the expert witness in relation to the patient's death. However, the court went on to rule that the error was harmless, because of the witness's testimony concerning causation, and in view of the entire record in the case.

In the present case, based on the record in its entirety, we find that these evidentiary errors do not constitute a basis for reversal.

The hospital and physicians complain of the failure of the trial court to disqualify one or all of the plaintiffs' counsel. Margaret Covington, a licensed attorney with a Ph.D. in psychology, works as a consultant in jury trials and is a specialist in "shadow juries" and the use of demographics in preparing for trial. Victor Hlavinka, an attorney for the hospital, read an article in *People* magazine about Covington and telephoned her to arrange a meeting which later occurred in Dallas. Covington testified that the facts of the case were discussed only in general terms at the Dallas meeting. She then prepared a proposal for "jury management" for the case and submitted it to the counsel for the hospital. This proposal was rejected, and it was decided that Covington would not become involved as a consultant for the hospital.

Covington submitted a bill and was paid for her consulting work. She was later retained by counsel for the Birchfields and appeared at trial on their behalf. Counsel for the hospital first learned of her involvement on behalf of the Birchfields on the morning of the first day of the trial, and a motion to disqualify her as well as the other counsel was made at that time. The trial court overruled the motion.[1]

While counsel for the hospital took the position that there was some discussion of the specific case, Covington testified that there was no mention of any clients or specific case, and that her bill was sent only because counsel had invited such a bill and indicated the approximate amount. The bill did not indicate any specific case or client, and was paid by counsel for the hospital, who later relayed the cost to the hospital's insurance company. Covington testified that counsel for the hospital never revealed any specifics, but said that there was a possibility that she could be used in several cases and talked about the techniques which would apply to medical malpractice cases. She further testified that she did not want to send a bill because she felt it was more of a social engagement, the discussion having been over dinner at a very expensive restaurant. The trial court apparently accepted her testimony to the effect that no confidential information was divulged and that the general discussion did not constitute being retained as counsel for the specific client in this specific case.

For an attorney to be presumed to be using confidential information in an action against a former client, the test is whether the matter in which he represented the former client is substantially related to the present action. The rule underlying the "substantially related" test is that an attorney will be disqualified if a substantial relationship can be shown between the subject matter of the former representation by

---

1. The filing of a writ of mandamus would be a better procedure than awaiting the outcome of the main trial. The disqualification issue should not be allowed to interfere with the fair disposition of the suit. Writs of mandamus have been entertained on disqualification situations in *White v. Reiter,* 640 S.W.2d 586 (Tex.Crim.App.1982); *Stocking v. Biery,* 677 S.W.2d 792 (Tex.App.—San Antonio 1984, no writ).

the attorney and the subsequent representation. *Lott v. Ayres,* 611 S.W.2d 473 (Tex. Civ.App.—Dallas 1980, writ ref'd n.r.e.). The attorney cannot defeat the motion to disqualify by showing he received no confidential information from the former client. *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 395 (S.D.Tex.1969).

■ Margaret Covington submitted a bill to attorney Hlavinka on a statement from her law office for professional services. The bill reflected charges for two telephone conferences, preparation for the meeting with attorney Hlavinka, and for meeting with attorney Hlavinka regarding assistance in jury selection, interpretation of nonverbal communication, demographic analysis and community attitudinal analysis, drive-by evaluations of potential panel members' homes, and for travel from San Antonio to Dallas. She listed expenses in the amount of $126.20 and a fee in the amount of $600.00. The name of the case did not appear upon the statement, but Mr. Hlavinka sent the statement with a cover letter to the insurer, and the cover letter indicated the reference: Phillip J. Birchfield, et al v. Texarkana Memorial Hospital, et al. When the check was received by Hlavinka, he forwarded it to Covington with a cover letter showing subject to be Birchfield v. Wadley (Texarkana Memorial Hospital, Inc. is generally referred to as Wadley Hospital).

The trial court apparently accepted the testimony by Covington that she was not retained in the case, but met with the counsel only for general discussions about her work. The trial court's decision on disqualification will be reversed only upon a clear abuse of discretion. We find no such abuse in this instance.

The hospital and the physicians further complain about the admission of Exhibit #25 because it constituted hearsay, contained the statements of strangers to the suit, and purported to relate statements for which the parties did not personally vouch.

Exhibit #25 purported to be a transcription of the proceedings of a conference among pediatricians including Drs. May, Wright, Rorie, Burroughs, Hall and Lowe (only Hall and Lowe are parties to the present suit). This conference occurred in the office of James R. Hubbard, a Texarkana attorney, and he testified that, to the best of his remembrance, the transciption appeared to be accurate. The conference was held in conjunction with another pending lawsuit. The document had been transcribed by several secretaries in a typing pool. The tape from which the transcription was made was not available at trial. Mr. Hubbard further testified that he recognized no substantial inaccuracies and that he believed that the statements attributed to the people in the exhibit were the statements made during the meeting in his office.

Based upon the testimony and the situation for which the recording was made, the trial court found the document to have special reliability.[2] In essence, Hubbard vouched for the accuracy of the statements contained within the document, although he could not be one hundred percent sure of its accuracy because of the time lapse of several years. Counsel for the hospital complained that the exhibit contained gaps and blanks which indicated some additional conversation.

■ Even hearsay within hearsay is permissible under Tex.R.Evid. 805 if it conforms with an exception to the hearsay rule. The trial judge found under Tex.R. Evid. 901(b)(1) that the transcript was what it claimed to be.

The trial court spent half of one day going through the document to exclude portions which he deemed not admissible. The portions of the transcript which remained were all statements attributable to parties in the present suit except for two statements made by Dr. May and questions being asked by Mr. Hubbard. The questions asked by Mr. Hubbard were necessary for the context of the statements by the parties, and the trial court correctly ruled that the context shows that Dr. Hall adopted the previous statement made by

2. Fed.R.Evid. 803(24) contains an exception to the hearsay rule which provides for admission when the circumstances guarantee the trustworthiness. The Texas Rules of Evidence did not incorporate this exception.

Dr. May by the tenor of his acknowledgement to his statement in accordance with Tex.R.Evid. 801(e)(2)(B).

 The statements are admissible as admissions by party-opponents.[3] Tex.R. Evid. 801(e)(2). The fact that there are gaps in the transcribing of the statement does not exclude its admission. This is analogous to a situation where a person is testifying and cannot remember an entire conversation, but does remember significant portions of it. If statements which were omitted were important, the adverse party would have an opportunity to rebut the evidence by placing it in context. In the present case, Dr. Lowe took the stand to explain the context of one of the statements which was attributed to her. We find no error in the admission of portions of this document.

The hospital and physicians complain of the admission of hearsay statements through witnesses Eichenwald and Ehrenkranz.

Dr. Eichenwald was questioned as follows:

Q And when Doctor Lucey says that its cause in these small infants is not known, that's contrary to what you have just said in response to his questions. Is that correct?

A No, I think it's your interpretation of that statement that is contrary. If you will let me explain, perhaps I can.

Q Go right ahead.

A Well, when this article appeared in February, I read it. I made some notes on it for myself, because I was going to review it for another journal, and then it became evident that I was going to be called as a witness, here. Because I had arrived at certain conclusions about the article, I called Doctor Lucey and discussed with him what his intention was

. . .

At this point, counsel for the hospital objected to the hearsay nature of the answer. Then there was a discussion between the court and the attorneys and the last two questions were read back by the court reporter. The court then *sustained* the objection. Then the witness proceeded to give a lengthy answer which included the hearsay in spite of the fact that the objection had been sustained. The answer was as follows:

A Okay, as I indicated, I called Doctor Lucey, whom I have known since my Cornell days, and asked him why he wrote the article, was there any particular purpose, and also what was his interpretation of some of the statements that were made. Well, it appears—Doctor Lucey told me that he had already heard from a number of other pediatricians who had asked him similar questions. He indicated first that he had written the article in order to try to—and this is a direct quotation—perhaps redress the balance a little better as far as the reports of oxygen was concerned. The second reason he gave, which was that he had been involved in a large Japanese class action suit involving retrolental fibroplasia, and that this material had been gathered to some degree in order to be of assistance in that large class action suit. I was interested, because of course that explains the large number of Japanese. We don't know if it was in the Japanese journals, because we can't read Japanese. And then he said to me, "You know, this article is being widely misinterpreted. It was my intention to point out that in infants, in small infants, tiny infants, with multiple conditions, infants who were severely ill, and he specifically excluded the respiratory distress syndrome, there are factors other than oxygen that enter into reproduction of retrolental fibroplasia." We talked about that

---

**3.** One of the statements contained in the document which tends to demonstrate that the contents included admissions was attributed to Dr. Hall as follows:

It was back in '71 or '70 it was in that period—it was very early—because I made the

statement in section meetings—the exact statement—the only kind of practice we are capable of at Wadley Hospital in the nursery is malpractice—

just for a couple of minutes, and he specified the conditions which I had listed as the ones that he had mentioned in his particular—in his article which we just discussed. He was primarily concerned with infants who had severe hemorrhages, who had right to left shunts where very abnormal oxygen levels can occur, and things like that. He said, quote, and I believe this is a direct quote, "It was never my intention to indicate that oxygen would not cause retrolental fibroplasia when it was given in excess amounts to normal babies." I then took the liberty of—I told him before this started that I was involved in a malpractice suit, and I took the liberty of telling him as honestly as I could the facts of the Kellie Birchfield case ...

Counsel for the hospital again objected to the hearsay after the above testimony had been offered, and this time the court said:

THE COURT: Yes, you may repeat your objection to hearsay as to the conversation with Doctor Lucey. It's the opinion of the Court it was called for by your prior question. It is my opinion it has been answered by the witness. Now let's move along.

■■■■■ The Birchfields contend that the attorney's question which instructed the witness to "go ahead" with his explanation opened the door for the witness to state his reasons, whether based upon hearsay or not. When a party elicits an answer, he should not be allowed to complain because the answer was unfavorable. *San Antonio & A.P. Ry. Co. v. Cockvill,* 72 Tex. 613, 10 S.W. 702 (1889); *Smith v. Oldham,* 26 Tex. 533 (1863); *International Brotherhood of Boiler Makers v. Rodriguez,* 193 S.W.2d 835 (Tex.Civ.App.—El Paso 1945, writ dism'd); *El Paso & S.W. Ry. Co. v. Smith,* 50 Tex.Civ.App. 10, 108 S.W. 988 (1908, writ ref'd). However, we do not find that asking the witness to explain why he disagreed with the attorney's interpretation of Dr. Lucey's article invited the hearsay included in the answer.

■■■■ As to Dr. Ehrenkranz, the trial court ruled that cross-examination of the witness was calculated to cast innuendos as to why he appeared to testify instead of Dr. Warseau and Dr. Rosenfeldt. The answer which is the subject of the complaint is as follows:

A Dr. Rosenfeldt requested or asked me whether I would be interested in being a consult (sic) in this case, because after his brief review of the record, he felt that the care had been negligent.

We do not find that the defensive posture taken by the hospital and the physicians would permit the injection of hearsay evidence.

However, in view of the entire record, we do not believe the errors in admitting these hearsay statements were calculated to produce an improper result in the case.

The second portion of Dr. Ehrenkranz's testimony about which a complaint is made involves whether or not the Birchfield baby could have been transferred to another hospital. Counsel for the Birchfields take the position that Tex.R.Evid. 705 expressly allows an expert to state the underlying facts upon which he bases his opinion. At the time of trial, Rule 705 read as follows:

■■■■ Disclosure of Facts or Data Underlying Expert Opinion

The expert may testify in terms of opinion or inference and given (sic) his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

This rule cannot be used as a guise to use one's own expert witness to get in hearsay testimony. The questioner is no longer required to use hypothetical questions, and if hypothethical questions are used they may be short and to the point. On cross-examination, inquiries may be made as to the underlying facts or data which involves hearsay.

■■■■ In the present case, the witness Ehrenkranz testified concerning the avail-

ability of space in Dallas hospitals to which the Birchfield baby might have been transferred. Although the witness was not taken on voir dire to show that he did not possess personal knowledge of this availability, his testimony indicated that he was from Connecticut and lacked personal knowledge about Texas hospitals. This objection should have been sustained. However, we do not find that the admission of the testimony constitutes reversible error, because Dr. Eichenwald, who had personal knowledge, had already told the jury, without objection, that space would have been available in the Dallas hospitals. Therefore, the testimony was of a cumulative nature.

■■■ The hospital and physicians complain that the trial court erred in permitting the Birchfields to introduce evidence concerning the financial condition of the hospital.

The hospital, through its administrator, took the position that from 1968 to 1974, the hospital did not have the money to provide for proper equipment and personnel training. Counsel for the hospital entered into a stipulation that the hospital was financially capable of responding to the need to purchase equipment and train nurses.

For purposes of impeachment as well as for the gross negligence issue, the financial condition of the hospital was admissible. Tex.R.Evid. 401, 402; *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981).

■■■ The hospital and physicians complain of a reference made to the pediatric section minutes. In the cross-examination of McElmurry, a witness for the hospital and physicians, the following question was propounded:

Q Did you review the pediatric section minutes, to see if the statements by Doctor Lowe and Doctor Hall were in them, sir?

A Did I what?

Tex.Rev.Civ.Stat.Ann. art. 4447d, § 3 (Vernon Supp.1986) provides as follows:

Sec. 3. The records and proceedings of any committee or joint committee of a hospital, medical organization, university medical school, university health science center, or extended care facility, whether appointed on an ad hoc basis to conduct a specific investigation or established under state or federal law or regulations or under the by-laws, rules or regulations of such organization or institution, shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records and shall not be available for court subpoena; ....

Counsel for the hospital objected to the question, and the court outside the presence of the jury sustained the objection. Counsel for the hospital and physicians made a motion for mistrial which was denied. The court offered to make an appropriate instruction to the jury if the defense insisted, but the defense declined. The trial court opined that the jury had "no concept of what he was actually driving at."

While the minutes of such hospital staff meetings are exempt from discovery and inadmissible in evidence pursuant to the statute and *Texarkana Memorial Hospital, Inc. v. Jones,* 551 S.W.2d 33 (Tex.1977), we do not find this isolated reference to such minutes to constitute reversible error.

■■■ The hospital and physicians contend that the trial court erred in allowing references to other patients who had suffered blindness. Evidence of other incidents under reasonably similar but not necessarily identical circumstances is admissible to support a contention of negligence. *Missouri-Kansas-Texas Railroad Co. v. May,* 600 S.W.2d 755 (Tex.1980). The hospital and physicians complain that the proper predicate was not laid to establish the similarity of conditions. The evidence did demonstrate that the vision problems with all of these children were caused by retrolental fibroplasia, which was the same condition involving the Birchfield child. Inasmuch as the Birchfields contended the causation was the administering of oxygen by

the hospital and physicians, a predicate should have been laid which showed that oxygen had been improperly administered to the other patients who developed vision problems. However, to the extent that the Birchfields failed to lay the proper predicate, the objections to this evidence was waived by the testimony of Dr. Lowe as to these specific cases of retrolental fibroplasia. Where a party has objected to evidence of a particular fact and later produces evidence from his own witness of the same fact, he will be deemed to have waived his objection. *Simmons v. Capital Diesel & Industrial Machine Works, Inc.,* 380 S.W.2d 191 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.); *McDonough v. Zamora,* 338 S.W.2d 507 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.); *Maizel v. Bush,* 337 S.W.2d 337 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.); *City of Houston v. Howe & Wise,* 323 S.W.2d 134 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.); *Dohoney v. Womack,* 1 Tex.Civ.App. 354, 19 S.W. 883, *aff'd on rehearing,* 1 Tex.Civ. App. 354, 20 S.W. 950 (1892, writ ref'd).

The hospital and physicians contend that the trial court erred in allowing questioning, evidence and argument concerning the settlement by the hospital of a prior suit known as the Reppond case. In answer to this argument, the counsel for the Birchfields respond that this settlement was only mentioned three times during the course of a six-week trial and more than 4,500 pages of testimony. Counsel for the hospital contends that the trial was three weeks in duration, that the settlement was mentioned five times, and that the references were very general in nature.

The hospital and physicians had filed a motion for continuance, because the local paper had run an article on the Saturday before the trial which referred to Respond as being a similar case in which a "boy was also blinded by over exposure to oxygen." The newspaper further stated that according to unnamed sources, the "case was reportedly settled out of court for $900,-000.00." A large number of the jury panel indicated to the judge during voir dire that they had read about the Birchfield case in the newspaper. The judge called all of those in chambers who stated that they had heard of the Birchfield case. The three jurors from the panel who ultimately served on the jury were questioned to determine if they had any bias because of what they had heard, and each indicated that he or she had not formed an opinion. They also told the court that they were not familiar with any other case like the Birchfield case.

The appellants filed a motion in limine which sought to prevent introduction of evidence of "[a]ny other litigation to which this Defendant has been a party;" "[t]he facts or circumstances involved in any other litigation to which this Defendant is or has been a party;" and also "[t]he fact or alleged fact that any other suit or suits have been filed or prosecuted in which the claim is made that another child or other children treated at Wadley Hospital ever suffered from or were afflicted with retrolental fibroplasia or any similar disease, defect or condition or any disease or defect similar to the alleged injury suffered by the Plaintiff, Kellie Birchfield." This motion in limine was temporarily overruled.

During the examination of the plaintiffs' expert, a deposition from the Reppond case was being used. The witness inadvertently stated that he had not gone over the deposition to make corrections, because "the case was settled." Counsel at that point requested that he be allowed to make a motion outside the presence of the jury at the appropriate time. The witness again mentioned the settlement of the Reppond case in the following context:

A. Yes, I was just getting ready to say that when you interrupted me. As far as my memory serves, I heard about Kellie *after the Reppond case had been settled,* and it was probably two or so years thereafter that I obtained any other information about this particular case, but it is very difficult to remember exactly when that was. (Emphasis added.)

At the next opportunity, the appellants made a motion for mistrial outside the presence of the jury, which was overruled.

Later in the trial, counsel for the Birchfields posed the following question to one of the defendants:

> Q. And in addition to that case, you told the jury earlier that the Reppond case was a case where the baby's problems were caused by some intrauteral problems with the baby, and not by supplemental oxygen. *That certainly did not appear to be the opinion of Wadley Hospital and Collom & Carney Clinic when they paid that family in the case, did it, Doctor?* (Emphasis added.)

After objection, the court instructed the jury to disregard the question, and denied a motion for mistrial.

The Reppond case was mentioned and referred to numerous times during the trial, but only one other time was the settlement of the case mentioned[4] and this was in final argument when counsel stated the following:

> Doctor Eichenwald said I have been practicing medicine and working with babies now for about thirty years and on about ten occasions during that period of time I have seen examples of my fellow doctors and hospitals doing things that weren't right, and I have had—I have been willing to help other babies, to come forward and say that. And yes, now that he got into it, Doctor Eichenwald did say he had looked at five cases that I had asked him to over the several years that I have known Doctor Eichenwald as Chairman of the department out there at the med school. *One of those was Elton Reppond, and he thought that was malpractice and that lawsuit got settled, as it should have.* (Emphasis added.)

The court overruled the objection and motion for mistrial made by the appellants at that time.

■■■ There is a line of cases in Texas to the effect that a plaintiff may prove that the defendant had paid the claims of other persons whose damages resulted in the same manner as the plaintiff's damages.

R. Ray, *Texas Law of Evidence Civil and Criminal* § 1150 (Texas Practice 3d ed. 1980). However, where the matter is in controversy and is settled on a compromise basis, this is clearly not the rule. The proof before the jury of a compromise settlement is inadmissible. *Otwell v. Scott,* 425 S.W.2d 9 (Tex.Civ.App.—Texarkana 1968, no writ).

Rule 408 of the Texas Rules of Evidence clearly provides in part that evidence of a compromise or offers to compromise a claim which was disputed as to either validity or amount is not admissible to establish liability for, or invalidity of, the claim or its amount.

Rule 408 does not require exclusion when the evidence is offered for another purpose, but in the present case no other purpose than to help establish liability can be determined.

■■■ This rule is not limited to settlements or offers of settlement between the parties of the litigation, but also applies to settlements of prior litigation which may also involve another party. The introduction of evidence as to the settlement of the Reppond case flies clearly in the face of this rule. Although the amount of the settlement was not mentioned, the clear purpose for injecting this fact into the record was to establish an admission of liability in litigation of a similar nature and to prove liability for the Reppond claim.

Although the improper argument to the jury tended to compound the error, we cannot say that this misconduct and this evidence amounted to such a denial of rights that it was calculated to cause and did cause rendition of an improper judgment. Tex.R.Civ.P. 434; *Texas Farm Products Co. v. Stock,* 657 S.W.2d 494 (Tex.App.—Tyler 1983, writ ref'd n.r.e.).

■■■ The hospital complains that throughout the charge a general reference is made to officers, directors, vice-principals, agents, servants, or employees, and that these general terms do not confine the

---

**4.** The Reppond settlement was mentioned during the Hubbard examination, but this was outside the presence of the jury and no objection was made at that time.

jury's considerations to matters which have been pled and proven.

The case of *Scott v. Atchison, T. & S.F.R. Co.*, 572 S.W.2d 273 (Tex.1978), provides that various alternative methods permitting simpler and broader submissions of controlling issues are within the discretion of the trial court so long as negligence and causation issues are limited in some manner to acts or omissions which are raised by pleadings and evidence in cases where there is a material variance between pleadings and evidence.

The hospital in its brief did not point out any variance between the pleadings and evidence as to negligence and proximate cause. The special issues limit the jury's consideration to certain categories of negligence. The jury was duly instructed to base its verdict on the evidence. We cannot conclude that the jury went outside of the record to find some negligent acts of some agent or employee which were not presented at the trial. The wording of the special issues does not purport to tell the jury that every agent was involved in every act, but rather inquires of the jury whether any agent or employee was guilty of the alleged conduct. Such a broad submission is permissible under the rules. The hospital has cited no evidence whereby the jury could have been misled to apply negligence to persons for whose conduct the hospital was not legally liable. No limiting instruction was necessary except the general instruction requiring the jury to base its verdict on the evidence.[5]

The hospital and physicians complain that the language used in special issues numbered 1, 2, 3, and 4 assumes that any negligence found was a proximate cause of the blindness of Kellie Lee Birchfield. The wording of the issues is as follows:

QUESTION NO. 1

Do you find from a preponderance of the evidence that Wadley Hospital, its officers, directors, vice-principals, agents, servants or employees were negligent in the care and treatment of Kellie Lee Birchfield with respect to any of the following which was a proximate cause of her blindness? Answer "yes" or "no" to each item: (Emphasis added.)

A. As to adequate nursing services _____

B. As to timely providing nursery equipment _____

C. As to adequate laboratory operation _____

D. As to administration of oxygen _____

E. As to administrative responsiveness to pediatrician requests for nursery upgrading _____

F. As to charting _____

QUESTION NO. 2

Do you find from a preponderance of the evidence that Doctor Jon Hall was negligent in his care and treatment of Kellie Lee Birchfield with respect to any of the following which was a proximate cause of her blindness? Answer "yes" or "no" to each item: (Emphasis added.)

A. As to administration of the oxygen _____

B. As to monitoring of blood gases _____

C. As to failing to transfer Kellie _____

D. As to prescription orders to nurses _____

E. As to direction of nurses _____

F. As to failing to obtain informed consent _____

. . . .

---

**5.** The charge included the following language: "In answering the following questions you are limited in your deliberations to such matters as have been introduced into evidence and received by the Court, and you will not consider or discuss anything not represented by such evidence."

QUESTION NO. 3

Do you find from a preponderance of the evidence that Doctor Noel Cowan was negligent in his care and treatment of Kellie Lee Birchfield with respect to any of the following which was a proximate cause of her blindness? Answer "yes" or "no" to each item: (Emphasis added.)

A. As to administration of the oxygen _____

B. As to monitoring of blood gases _____

C. As to failing to transfer Kellie _____

D. As to prescription orders to nurses _____

E. As to direction of nurses _____

QUESTION NO. 4

Do you find from a preponderance of the evidence that Doctor Betty Ann Lowe was negligent in her care and treatment of Kellie Lee Birchfield with respect to any of the following which was a proximate cause of her blindness? Answer "yes" or "no" to each item: (Emphasis added.)

A. As to administration of oxygen _____

B. As to monitoring of blood gases _____

C. As to failing to transfer Kellie _____

D. As to prescription orders to nurses _____

E. As to direction of nurses _____

---

Tex.R.Civ.P. 277 liberalized the method of the submission of special issues. The rule specifically states that:

Conditioned upon an affirmative finding of negligence as to one or more acts or omissions, a further question may inquire whether the corresponding specific acts or omissions (listing them) inquired about in the preceding questions were proximate causes of the accident, event, or occurrence that is the basis of the suit. . . .

However, this rule has not been construed to preclude submitting both negligence and proximate cause in one issue. In the case of *Metal Structures Corp. v. Plains Textiles, Inc.,* 470 S.W.2d 93 (Tex. Civ.App.—Amarillo 1971, writ ref'd n.r.e.), the court approved the submission of a question inquiring as to defect and proximate cause in one issue. In the case of *Members Mutual Insurance Co. v. Muckelroy,* 523 S.W.2d 77 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.), negligent conduct and proximate cause were submitted in one issue.

Rule 277 of the Rules of Civil Procedure further provides as follows:

It shall be discretionary with the court whether to submit separate questions with respect to each element of a case or to submit issues broadly. It shall not be objectionable that a question is general or includes a combination of elements or issues. . . .

The problem with the language used in the present case, i.e., "which was a proximate cause of her blindness," is whether the clause is language of inquiry or language informing the jury of the existence of a fact. In other words, is the judge asking the jury or telling the jury about the existence of proximate cause?

Rule 277 prohibits the trial court from directly commenting on the weight of the evidence; furthermore, proximate cause is an essential element that must be found by the jury. While it is acceptable that a question is multifarious, it must be clear to the jury that they must find each required element. When multifarious issues are used, the danger of ambiguity is increased. Sometimes this problem can be

cured by the use of such qualified words as "if any" or "if you so find." In the present case no qualifying words were utilized.

Counsel for the Birchfields cite *Lemos v. Montez,* 680 S.W.2d 798 (Tex.1984),[6] for approval of a special issue including both negligence and proximate cause. In this case the following issue was used:

> Whose negligence, if any, do you find from a preponderance of the evidence proximately caused the collision ...?

In the *Lemos* case, under the proof and pleadings, one party or the other by law was negligent and proximately caused the occurrence (an unavoidable accident having been negated). So the question posed was whether one party or both parties were guilty of negligence (inserting the important words "if any") which proximately caused the occurrence. In the present case, the questions involve only the defendants and the existence of proximate cause cannot be presumed.

A special issue is objectionable if it assumes a disputed fact in issue or is phrased so that it produces an ambiguous response. *Baker Marine Corp. v. Moseley,* 645 S.W.2d 486 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). It is error to submit to the jury a special issue which assumes the existence of disputed material facts. *Capital Title Co. v. Mahone,* 619 S.W.2d 204 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). In the present case, proximate cause was very much a material and disputed issue.

The present version of Rule 277 does not eliminate the requirement that special issues should be submitted to avoid confusing or misleading the jury and should be worded in a manner which will not amount to a comment on the weight of the evidence or lead the jury to believe that a controverted fact is assumed. *Pullen v. Russ,* 226 S.W.2d 876 (Tex.Civ.App.—Fort Worth 1950, writ ref'd n.r.e.).

Counsel for the Birchfields argue that even if the issue was not correctly submitted, the objections were waived, because they were too voluminous and failed to distinctly point out the complaint, citing *Monsanto Company v. Milam,* 494 S.W.2d 534 (Tex.1973).

The physicians filed two pages of written objections to the charge of the court. The first objection reads as follows:

> Defendants object to the Court's Questions No. 2, 3 and 4 on the ground that they assume that any negligence as to any of the categories of which inquiry is made in subparagraphs A through F thereof was a proximate cause of the blindness of Kellie Birchfield whereas such issue is a contested issue.

The hospital filed thirteen pages of special issues, and on page three under paragraph V, the objection reads as follows:

> Defendant objects to the Court's Question No. 1 on the ground that it assumes that any negligence as to any of the categories of which inquiry is made in subparagraphs A through F thereof was a proximate cause of the blindness of Kellie Birchfield whereas such issue is a contested issue....

This language clearly and distinctly points out that they are complaining by their objections that the wording makes the assumption that any negligence was a proximate cause of the child's blindness.

While objections to the charge of the court by the attorney for the hospital are lengthy, the objections made by the attorney for the physicians are brief and to the point. Only one objection is made as to questions 2, 3, and 4, and that is the objection set forth above. The nature of this objection, its brevity, and its place of prominence in the list of written objections was sufficient to draw the attention of the court to the errors in the charge. This should have also alerted the court to the ambiguity problem in question 1, which was pointed out by the hospital's objections,

---

6. The court did not approve the issue as submitted, because it allowed for the finding of "none" in a case in which the pleadings and

evidence did not raise the possibility of an unavoidable accident.

although encompassed in a greater volume of objections.

■ While grammatically the language in the present case presents an ambiguity that could be construed as a comment on the weight of the evidence, there are two factors that make it more likely that the jury would construe the issue as requiring them to find the element of proximate cause. First, both sides in their summation argued the issue of proximate cause as one to be found by the jury. Second, the trial court used the singular verb of being *was* instead of the plural form. If the trial court had been telling them that all the listed items were the proximate cause, then the trial court would use the plural form of the verb. Instead he is asking on each item which was found to be negligent if this was the proximate cause.

In the case of *City of Amarillo v. Langley*, 651 S.W.2d 906 (Tex.App.—Amarillo 1983, no writ), the trial court had asked the following question:

> Do you find from a preponderance of the evidence that on the occasion in question Ronald Hudson knowingly used excessive force in arresting or aiding in the arrest of Thomas E. Langley, John Langley, and Jada Lynn Malone, which proximately caused the injuries and damages suffered by them, if any?

This language is very similar to the language employed in the present case. The qualifying term "if any" is used to refer to injuries and damages and not proximate cause. The court found that this language was not a direct comment on the weight of the evidence and was not an attempt to lead the jury to any particular answer.

Language is essentially defective in precision. *Martin v. Hunter*, 4 U.S. (1 Wheat.) 304, 4 L.Ed. 97, 114 (1816). Such is the character of human language that no word conveys to the mind, in all situations, one single definite idea. *M'Culloch v. Maryland*, 14 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

While the form of the special issue question is not to be recommended, we think it unlikely that the jury was misled or that the jury construed it as a comment on the weight of the evidence.

■ The hospital complains of the failure of the trial court to include a reference to "this or similar communities" within the definitions of negligence and ordinary care as those terms pertain to the hospital.

Counsel for the Birchfields cite *Peterson v. Shields*, 652 S.W.2d 929 (Tex.1983), as abolishing the locality rule. A careful reading of that case indicates that the ratio decidendi was that the Medical Liability and Insurance Improvement Act, Tex.Rev. Civ.Stat.Ann. art. 4590i, § 6.02 (Vernon Supp.1986), altered the common law requirement for focusing on the locality in disclosure cases. To that extent, the case overruled *Wilson v. Scott*, 412 S.W.2d 299 (Tex.1967).

The cases of *Webb v. Jorns*, 488 S.W.2d 407 (Tex.1972); *Dupree v. Palmarozzi*, 596 S.W.2d 544 (Tex.Civ.App.—Beaumont 1980, no writ); and *Christian v. Jeter*, 445 S.W.2d 51 (Tex.Civ.App.—Waco 1969, writ ref'd n.r.e.), indicate that a trial court has discretion in the administration of the community standard, and that any other treatment of the rule would mean that some communities would be measured by standards which fall beneath those universally regarded as ordinary medical standards. These cases deal primarily with the admissibility of evidence.

In the case of *Hickson v. Martinez*, 707 S.W.2d 919 (Tex.App.—Dallas 1986, no writ) (not yet reported), the court held that a reference to the locality rule in the definitions of "negligence," "ordinary care," and "proximate cause" was harmful error, because it tended to emphasize a defensive theory and therefore constituted a comment on the weight of the evidence.

For purposes of the charge in a medical malpractice action, the questions should convey to the jury a standard based upon what reasonable and prudent members of the medical profession would have done under the same or similar circumstances. *Hood v. Phillips*, 554 S.W.2d 160 (Tex. 1977).

■ The medical testimony professed familiarity with the standard of care in the Texarkana area, and the fact that the expert may be from a large city does not preclude testimony concerning standards in a smaller community. *Christian v. Jeter, supra.*

The hospital further complains of the definition of negligence and ordinary care which refers to the hospital's "accepting for treatment and care premature infants." The hospital asserts that this is a direct comment on the evidence.

■ Even though a fact is assumed in a special issue, if the fact is not disputed or controverted, there is no error. *Vahlsing Christina Corp. v. Ryman Well Service, Inc.,* 512 S.W.2d 803 (Tex.Civ.App.— Corpus Christi 1974, writ ref'd n.r.e.). In the present case, the hospital does not contend that it did not accept premature infants sometimes from outlying areas, but rather contends that it did not hold itself as a referral center for premature infants. The language used by the court does not speak to whether or not the hospital held itself out as a referral center for premature infants, but merely whether such infant were accepted for treatment and care. We find this to be a fact undisputed by the evidence.

■ The hospital and physicians assign both no evidence and insufficient evidence points to the jury's findings of negligence and proximate cause. In reviewing no evidence points, the court considers only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary or conflicting evidence. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981). Insufficient evidence points require the court to consider and weigh all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

Three doctors testified on behalf of the Birchfields that the cause of RLF blindness in Kellie Birchfield was the excessive use of supplemental oxygen.[7] The expert testimony further indicated that blindness or death would not occur if arterial oxygen measurements were made and regulated to provide only the amount of oxygen needed. According to the testimony, the vascularization of the retina is underdeveloped in premature infants, and the vessels tend to constrict and twist about themselves when excessive oxygen is given. When the oxygen is withdrawn, the red blood cells tend to leak from the dilated vessels which results in the retina receiving an inadequate blood supply which adversely affects the optic nerve. This may further result in the retina detaching and collapsing behind the eye resulting in permanent blindness. It is possible for an infant to have early stages of RLF without becoming blind.

The jury found hospital negligence in regard to nursing services, equipment, laboratory operation, and administration of oxygen and the charting by the nursing staff. The jury found doctor negligence in the administering of oxygen, the monitoring of blood gases, the failing to transfer Kellie, the prescribing of orders and direction of the nurses, and the failing to obtain informed consent.

The evidence indicated that in spite of formal recommendations made in 1968 and in spite of warnings by local doctors, the nursery staff was not trained to monitor blood gases and RLF had been only informally discussed with the nurses. The evidence further indicated that a warmed incubator was not available for transporting Kellie from the delivery room to the nursery (this had also been recommended in

---

7. The physicians and hospital offered expert testimony that the cause of RLF was related to prematurity and that the cause was unknown. Their position was that the child would have died if she had not received the supplemental oxygen. The jury apparently rejected this contention. The hospital and physicians took the position that Kellie was a sick, premature infant which necessitated the oxygen, and the Birchfields took the position that although Kellie had had some problems initially, she was not a sick infant who required the continued use of oxygen.

the 1968 study of the hospital facilities). The failure to have this equipment available may have created the need for the administration of oxygen upon her arrival in the nursery. There was evidence that an Ohio intensive care unit which was needed for Kellie was not available when she first arrived at the nursery. There was evidence that the hospital laboratory did not have the ability to do reliable micro-blood gas analyses. There was evidence that the nurses were given discretion to regulate oxygen for Kellie so long as it was kept under forty percent and discretion to discontinue it as they saw fit. Kellie received 380 hours of supplemental oxygen under this instruction. The 1971 recommendations of the Committee on Fetus and Newborn included the following recommendation:

> The condition of infants requiring oxygen may improve rapidly. Under these circumstances, the inspired oxygen concentrations should be promptly lowered. If the infant's recovery is gradual, the oxygen concentrations should be lowered by 10% decrements, guided by blood gas measurements.

The evidence further indicates that Kellie was kept on oxygen for an extended period even though she had no signs indicating the need for oxygen. There was evidence that the oxygen was not gradually discontinued for Kellie, but was brought down from forty percent to zero. This act of rapidly decreasing oxygen concentrations was, according to Dr. Ehrenkranz, the cause of the RLF.

A statement of the Committee on Fetus and Newborn (American Academy of Pediatrics) [8] concerning oxygen therapy in newborn infants was read to the pediatric section and the administration at a pediatric section meeting in 1971. This statement included the following language:

> It is probable that even concentrations of 40% of inspired oxygen (formerly considered safe) could be dangerous for some infants.
>
> . . . .
>
> [I]t is difficult to judge the concentration of inspired oxygen necessary to maintain effective oxygenation of tissues by clinical signs in these infants. . . . [A]rterial blood gas measurements are extremely important for regulation of the concentration of inspired oxygen when an oxygen-enriched environment is necessary.
>
> . . . .
>
> However, if supplemental oxygen is necessary for an immature infant, he should be transferred to a center at which inspired oxygen concentration can be regulated on the basis of blood gas measurements.[9]

8. This language initially appeared in a newsletter entitled Committee Statement which began with the following language:
> The following recommendations will appear in the revision of the manual, *Standards and Recommendations for Hospital Care of Newborn Infants,* scheduled for publication early in 1971. Because the Committee felt a sense of urgency to provide these recommendations to pediatricians, family physicians, and other health professionals caring for newborn infants, they are being published prior to appearance of the manual.

When the revision of the manual was actually published, it contained the following in the introduction:
> This manual is meant to set general guidelines for future development rather than strict operating rules for currently operating nurseries and newborn intensive care units. Moreover, a deliberate attempt has been made to recommend idealized facilities rather than minimal standards because the Committee wishes to emphasize that the activities carried out in these areas are important enough to warrant an increased investment of community resources. Allowance must be made for local circumstances to dictate the way in which these guidelines are applied to best meet the needs of the particular hospital and the community it serves.
>
> It is contrary to the intent of the Committee to have its recommendations result in any rigid regulations which would obstruct responsible attempts at innovation or incorporation of new advances into units caring for newborn infants.

9. This language did not appear in the final recommendations made in the manual. Instead the manual contained the following:
> If blood gas measurements are not available, a mature infant who is not apneic but has generalized cyanosis may be given oxygen in a concentration just high enough to abolish the cyanosis. However, the infant born be-

According to expert testimony, blood gas tests were mandatory to prevent blindness because the blood gases show whether the oxygen is necessary and allow monitoring of whether too much oxygen is being given. Dr. Hall admitted that he never knew the true PO2 for Kellie. The one test sent to the laboratory came back with the finding of 227 for the PO2, nearly three times normal. Dr. Hall considered this finding to be an error. However, he did not send an additional sample for testing.

The Birchfields were never informed about any possible problems with respect to the risk in the administration of oxygen to Kellie. The evidence indicates that the three doctors shared the responsibility for Kellie's care.

We find that there is sufficient evidence both legally and factually to establish negligence and proximate cause.

The hospital complains that there was no evidence to support the jury's finding of gross negligence.

■■■ The test for gross negligence is both an objective and subjective test. The defendant's gross negligence may be proved by showing that the defendant had actual subjective knowledge that his con-

duct created an extreme degree of risk. In addition, a defendant's gross negligence may be objectively proven by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries Inc.*, 699 S.W.2d 570 (Tex.1985).

■■■ Factors to be considered in determining whether an award of exemplary damage is reasonable include the nature of the wrong, character of conduct involved, degree of culpability of the wrongdoer, situation and sensibilities of the parties concerned, and the extent to which the conduct offends the public sense of justice and propriety. *Houston Lighting and Power Co. v. Sue*, 644 S.W.2d 835 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■■■ The record shows that there had been external warnings as well as warnings from staff doctors of the inadequacies of the hospital nursery.[10] Yet there was evidence to indicate that the hospital chose to continue the treatment of immature infants without the upgrading for which funds were available. We find sufficient evidence in the record to support the finding of gross negligence.

---

fore 34 weeks' gestation or weighing less than 2,000 gm (4 lb, 7 oz) who requires an inspired oxygen concentration greater than 40% for more than brief periods should be treated, where feasible, in a hospital at which the inspired oxygen concentration can be regulated on the basis of blood gas measurements. A footnote referring to the foregoing section stated the following:

The Committee recognizes that, at the present time, this represents an optimal standard of care; and, it may well be impossible to arrange for such transfer because of lack of facilities and transport problems. The Committee hopes that, by making this recommendation, all concerned in the delivery of health care to the newborn infant will work toward making this standard a reality.

10. An assessment was made by Dr. Sheldon Korones in 1968 at the request of the hospital and the pediatric staff. His recommendations included the following:

The Nursery requires more registered nurses who should train at a large nursery center for at least one month after a trial period of employment at Wadley Hospital.... At least five registered nurses are essential, including

a Head Nurse, Assistant Head Nurse and Head Staff Nurses. These individuals must be adequately trained at the outset; and provisions must be made for continued enhancement of their skill....

A 1973 performance rating of the nursery supervisor stated: "... Needs to provide more educational development programs for [the] unit." A year later her performance rating said, "... Very little has been done to provide for educational development in the unit as suggested in the last evaluation."

Dr. Lowe testified that she had twice complained to the administration that the care in the nursery was totally inadequate. In October of 1971, she told the administration if they did not get the ability to monitor blood gases, they were going to be legally liable for blind babies.

In January of 1974, Dr. Wright and Dr. Lowe presented a report to the pediatric section and the administration which contained the following:

The most important factor in the successful care of premature infants is the skill, experience and number of the nursing staff....

■ The hospital further complains because the trial court refused to submit its proposed instruction in respect to the plaintiffs' gross negligence theory of recovery inquiring as to whether the defendant authorized any culpable conduct or such conduct had been committed by a person employed in a managerial capacity.

The jury was given the following instruction as a part of the gross negligence issue:

Before you are warranted in answering the above question "yes", the act or acts of negligence that you have found in answering the sub-parts of Question Number One must have been committed, authorized or ratified by a vice-principal of Wadley Hospital, which means:

a. a corporate officer;

b. those who have authority to employ, direct and discharge servants of the corporation;

c. those engaged in the performance of nondelegable or absolute duties of the corporation;

d. or those to whom the corporation has confided the management of the whole or a department or a division of its business.

We find that this instruction properly informed the jury concerning the hospital's liability for gross negligence.

■ The hospital further complains that the special issue on gross negligence was so clumsily phrased and so inartfully stated and so vaguely couched that the jury could not ascertain or fathom its meaning. The special issue in question is worded as follows: "Was the negligence of Wadley Hospital such as would amount to gross negligence?"

In addition to the instruction given above concerning authorization and ratification, the issue was accompanied by the following instruction:

You are instructed that "gross negligence" is the heedless and reckless disregard to the safety and welfare of Kellie Lee Birchfield. "Heedless and reckless disregard" means more than momentary thoughtlessness, inadvertance, or

error of judgment, but is such an entire want of care as to indicate that such negligence was the result of conscious indifference to the rights, welfare or safety of Kellie Lee Birchfield.

We find no error in the submission of this issue.

The hospital and physicians contend that the trial court erred in making repeated and impermissible comments on the weight of the evidence by virtue of the court's consistant refusal of the requests by counsel for the defendant for an instruction to the plaintiffs' witnesses Eichenwald and Ehrenkranz to be more responsive to the questions propounded on cross-examination and by admonitions to the defense witness Dr. Carruth to be more responsive to the questions asked by the plaintiffs' counsel. They further contend that the court erred by manifesting an attitude favorable to the plaintiffs and unfavorable to the defendants by virtue of its unequal treatment of the witnesses. We have reviewed the record and do not agree that the court erred in this regard.

The hospital and physicians further contend that while many of the points of error standing alone may not have constituted harmful error that the cumulative effect of the errors do constitute harmful error. After studying the record in its entirety, we do not find that the cumulative errors constitute reversible error.

The hospital and physicians complain that the trial court erred in allowing damages to the parents for interference with the parent-child relationship, for mental anguish, and for shock and emotional trauma upon learning of the blindness of the child.

■ The Supreme Court held in *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984), that mental anguish damages are recoverable when there is proof of a willful tort, willful and wanton disregard, or gross negligence. Thus, the gross negligence finding entitled the Birchfield parents to damages for mental anguish.

The Birchfield parents were led to believe that they were taking a well baby home from the hospital, and it was three weeks later when they took the child to a local ophthalmologist that they learned that the child was blind. Testimony indicated that the defendant Dr. Hall was aware that the child was blind before she left the hospital. Testimony further indicated that Mrs. Birchfield was in a state of shock upon learning of the child's blindness.

■ Special issue number 11 included separate sections for both mental anguish and shock and emotional trauma as follows:

What sum of money if now paid in cash do you find from a preponderance of the evidence would fairly and reasonably compensate the parents of Kellie Lee Birchfield for the damages proximately resulting from the occurrence in question.

You will consider the following elements of damages and none other and you will answer in dollars and cents, if any.

. . . .

C. Mental anguish suffered by Phillip J. Birchfield and Mary Jo Birchfield in the past and which, in reasonable probability, will be suffered by them in the future, resulting from the blindness of Kellie Lee Birchfield.

Answer with regard to each parent separately.

ANSWER: Phillip J. Birchfield _____
 Mary Jo Birchfield _____

D. Shock and emotional trauma sustained by Phillip J. Birchfield and Mary Jo Birchfield upon learning of the total and permanent blindness of Kellie Lee Birchfield.

Answer with regard to each parent separately:

ANSWER: Phillip J. Birchfield _____
 Mary Jo Birchfield _____

The terms shock and emotional trauma are such that the same damages would be encompassed by the term mental anguish. Subsection 11C asks the jury to evaluate the mental anguish the parents suffered from the blindness of their child. Subsection 11D therefore had been covered by the language in 11C. Because of this duplication, we set aside the damages awarded in 11D.

■ No Texas cases have been cited relating to the recovery of interference with the parent-child relationship in this situation. The Supreme Court recognized in the case of *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), that the measurement of damages for a child in a wrongful death case should not be limited to the economic loss measured by the value of the child's services to the parent.[11] The Court held that the parents in a wrongful death case were entitled to damages for the loss of love, advice, comfort, companionship and society as well as for mental anguish.

In the case of *Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978), the Supreme Court held that a spouse has a cause of action for loss of consortium (which is defined to mean affection, solace, comfort, companionship, society, assistance and sexual relations) that may arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence.

No reasonable distinction can be drawn between a spouse's right to recover for loss of companionship and society of the other spouse and a parent's right to recover for loss of companionship and society of a child. Prior to 1975, the courts in this country uniformly refused to permit recovery at common law for the loss of an injured child's or parent's society and companionship. Love, *Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship*, 51 Ind. L.J. 590 (1976). However, society and companionship between

11. The jury was asked in the present case the value of lost services and reached the answer of none.

parents and their children are closer to our present day ideal of the family unit than the right of the parents to the earning capacity during the minority which once seemed so important when the common law was originally established.[12]

In the present case, Kellie Birchfield's blindness resulted in a shattering effect on the relationship between her and her parents. The loss of the enjoyment of many experiences normally shared by parents and children are readily apparent. This is not to say that there will be less love between the child and her parents, but rather it is measuring the loss of the ability of the child to participate in many activities which normally involve parents and child.[13] We hold that damages to the filial relationship are compensable.

■ The hospital and physicians complain of the award of actual damages to Kellie Birchfield in the sum of $2,770,-500.00. The basis of their complaint involves the portion of the charge (special issue 10H) which relates to the "fair and reasonable value of services, aids and devices that in reasonable probability [Kellie Birchfield] will incur in the future after reaching the age of eighteen years." The essence of the argument is that the jury

was permitted to award damages for cost of services which are provided by the State free of charge.

We find no merit to this argument. Under the collateral source rule, such matters are not to be considered by the jury. There is no guarantee the government will continue to provide such services, and Kellie Birchfield is entitled to exercise her option to obtain other services than those offered by the government. *Century Papers, Inc. v. Perrino,* 551 S.W.2d 507 (Tex. Civ.App.—Texarkana 1977, writ ref'd n.r. e.); *City of Fort Worth v. Barlow,* 313 S.W.2d 906 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.).

■ The hospital and physicians complain that the trial court erred in refusing to require a substantial remittitur. Based upon the record, we find that no remittitur is required.

■ The Birchfields complain in two cross-points of the failure of the trial court to treble the actual damages pursuant to the Deceptive Trade Practices Act. Inquiries were made to the jury in questions numbers 6, 7, 8, and 9 and were found in favor of the Birchfields.[14]

---

12. For cases in other states recognizing these damages see "Parent's Loss of Child's Society and Companionship as Element of Damages for Injury to Child," 69 A.L.R.3d 553, 559 (1976).

13. The Supreme Court of Wisconsin came to the same conclusion in a case involving a child who was blinded as a premature infant after receiving excessive amounts of oxygen which caused retrolental fibroplasia. *Shockley v. Prier,* 66 Wis.2d 394, 225 N.W.2d 495 (1975).

14. QUESTION NO. 6
Do you find from a preponderance of the evidence that Wadley Hospital's nursery was improperly furnished with the necessary equipment or improperly staffed with personnel who had expertise in the specific area of neonatal care to provide adequate care and treatment for Kellie Lee Birchfield?
Answer "yes" or "no".
Answer: Yes
If you have answered Question No. 6 "yes", then you will answer Question No. 7; otherwise, do not answer Question No. 7.
QUESTION NO. 7

Was Wadley Hospital's failure to so advise Kellie Lee Birchfield's parents a deceptive trade practice?
In this connection you are instructed that a deceptive trade practice is any false, misleading or deceptive act or practice in the conduct of any trade or business, and the term "false, misleading or deceptive act or practice" means any act or omission or series of acts or omissions which has the capability of deceiving an average or ordinary person, even though that person may have been ignorant, unthinking or credulous.
Answer "it was a deceptive trade practice" or "it was not a deceptive trade practice."
Answer: Yes
If you have answered Question No. 7 "it was a deceptive trade practice," then you will answer Questions No. 8 and 9; otherwise, you will not answer Questions No. 8 and 9.
QUESTION NO. 8
Were the parents of Kellie Lee Birchfield adversely affected by such deceptive trade practice?
Answer "yes" or "no."
Answer: Yes

The Birchfields cite Section 17.43 of the Deceptive Trade Practices Act on cumulative remedies which states as follows:

> The provisions of this subchapter are not exclusive. The remedies provided in this subchapter are in addition to any other procedures or remedies provided for in any other law.

Tex. Bus. & Com. Code Ann. § 17.43 (Vernon Supp.1986).

In the case of *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.—Tyler 1984, no writ), the court states:

> Such an argument, however, overlooks the fact that the jury also found that each deceptive act or practice, as well as each act of negligence, was a proximate cause or a producing cause of the same damages.... Thus, on the facts in this case the award of exemplary damages was necessarily predicated on the same damages which were trebled on the basis of the findings by the jury of the violations of the DTPA and Section 16, art. 21.21 of the Insurance Code. Under this record, therefore, we conclude *that the award in the judgment of both treble and exemplary damages cannot stand because it does amount to a double recovery of punishment damages by the Alves resulting from the same acts or conduct.* (Emphasis added.)

Other Texas cases stating that the plaintiff should not be allowed to recover both exemplary damages and treble damages based upon the same act, because such would amount to a double recovery of exemplary damages are *Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r. e.); *Charlie Thomas Courtesy Ford v. Avalos*, 619 S.W.2d 9, (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); and *Riverside National Bank v. Lewis*, 572 S.W.2d 553 (Tex.Civ.App.—Houston [1st Dist.] 1978), *rev'd on other grounds*, 603 S.W.2d 169 (Tex.1980).

QUESTION NO. 9
Was Kellie Lee Birchfield adversely affected by such deceptive trade practice?

The Birchfields rely on the case of *Kish v. Van Note*, 692 S.W.2d 463 (Tex.1985). In the *Kish* case, the Supreme Court allowed the setting aside and canceling of the lien on the property, treble damages under the DTPA for the amount the plaintiffs paid on the installment contract, plus the cost of removing the pool and the cost of removing the lien, as well as a statutory penalty for violation of the Texas Consumer Credit Code. The penalty for the violation of the Texas Consumer Credit Code related to credit life insurance, being twice the time price differential or interest for which the parties contracted. Therefore, this remedy dealt with a different measure of damages and the damages under the DTPA (although some of the payments made on the installment contract may have included interest). Thus, the *Kish* case involved multi-faceted remedies which do not exist in the present case, and is not a situation allowing a trebling of damages plus exemplary damages for the same conduct. (The case of *Jim Walter Homes, Inc. v. White*, 617 S.W.2d 767 (Tex.Civ.App.—Beaumont 1981, no writ), is another example of remedies dealing with different measures of damages.)

The *Kish* case further provides for an election by stating:

> If the jury verdict contains more than one acceptable measure of damages, a plaintiff may be forced to elect prior to judgment the recovery he wants by waiving the surplus findings with respect to damages.

We do not rule on whether or not the Birchfields may have been entitled to treble damages under the facts presented in the finding of the jury, but if they were, they waived this entitlement by failing to make an election. The Birchfields submitted a proposed judgment which contained both the treble damages under the Deceptive Trade Practices Act as well as the $1,000,000.00 and $200,000.00 exemplary damages finding made by the jury.

Answer "yes" or "no."
Answer: <u>Yes</u>

The trial court correctly determined that the Birchfields were not entitled to a double recovery on punitive damages, and inasmuch as no election had been made, the trial court correctly allowed one of the measures of damages.

■■■ The Birchfields contend that the court erred in failing to provide a date certain for interest on the judgment to begin. Tex.Rev.Civ.Stat.Ann. art. 5069–1.-05 (Vernon Supp.1986) provides that judgments will earn interest beginning on the day the judgment is rendered. The only exception is in a case appealed in which a motion for extension of time to file a brief is granted for a party who was a plaintiff at the trial. In this situation the interest does not accrue for the period of the extension. The judgment should have expressly provided for the date of its commencement. It should further provide that interest will not run from July 26, 1985 to August 15, 1985, the period for which an extension of time was granted for filing the Birchfield brief. The judgment will be modified to specify the date of commencement of the interest on the date of judgment, and suspending the running of the interest from July 26, 1985 to August 15, 1985.

■■■ The Birchfields complain of the failure of the trial court to award prejudgment interest on those damages found by the jury which were sustained prior to the trial. The Supreme Court in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), held that prejudgment interest is allowable in cases involving wrongful death, survival and personal injury actions. The Birchfields have requested that this interest commence six months from the birth of Kellie Birchfield and that it terminate on the date of judgment. Pursuant to the *Cavnar* opinion, this interest should be compounded daily. Even though the Birchfields did not specifically plead and pray for prejudgment interest, the *Cavnar* case indicates that the principle is applicable to all cases in the judicial process at the time it was rendered. The judgment should be reformed to allow interest for this time period on past mental anguish and past physical pain at a rate of 10.79 percent compounded daily for 3,535 days (January 14, 1975 to September 18, 1984), amounting to $27,644.57.[15]

The judgment is affirmed with the deletion of $1,000.00 from the award to Phillip J. Birchfield and $1,000.00 from the award to Mary Jo Birchfield, and the judgment is also reformed to begin the running of interest on the date of the judgment, but providing that it will not accrue from July 26, 1985 to August 15, 1985.

BLEIL, J., not participating.

## ON MOTION FOR REHEARING

GRANT, Justice.

■■■ In the motion for rehearing, the Texarkana Memorial Hospital and the physicians called to our attention that we did not address appellants' points 23–26 in our original opinion. These points of error contend that the trial court erred in allowing immaterial evidence in opinion form on negligence, proximate cause, gross negligence, and heedlessness and recklessness in regard to the conduct of the physicians and hospital without requiring that the questions and answers be related to specific conduct raised by the pleadings and proof. We had not addressed these points of error, because we had already ruled that the experts could not testify as to mixed issues of fact and law. We agree with the contention that the questions and answers should

---

**15.** The formula for computing the future value of money earning compound interest during a period is:

$$FV = PV \times (1+i)^n;$$

Where FV = Future value,
PV = Present value,

i = Interest rate in decimals for the compounding interval,
n = Number of compoundings.

Thus, $FV = \$15,000 \times (1+.1079/365)^{3535}$
= $15,000 × 2.842971133
= $42,644.57

not be broader in scope than the pleadings and also that conclusions should be based upon specific conduct and should encompass only matters involved in the proof before the jury. We have again reviewed the references to which the hospital and physicians referred. In most instances, we find the context of the testimony or the specific references in the questions are sufficient to confine them to the pleadings and proof. In some instances, the questions and answers were so general that they may have encompassed matters outside of the pleadings and proof; however, in these four instances, no objection was made to the effect that they were outside of the pleadings and proof. Therefore, our finding of error remains as addressed in our original opinion.

In their motion for rehearing, the appellants urged the reconsideration of the point of error involving the failure of the appellees to lay the proper predicate before the introduction of other cases involving RLF.

They cite the recent decision of the Supreme Court of Texas in *Scurlock Oil Co. v. Smithwick*, 29 Tex.Sup.Ct.J. 449 (June 25, 1986). In that case the Supreme Court declared that the defendant was entitled to defend itself "by explaining, rebutting, or demonstrating the untruthfulness of the objectionable evidence without waiving its objections." In the *Scurlock Oil Co.* case, the Court was dealing with statements made during the closing arguments, not in the introduction of evidence. However, their language indicates that a defendant is entitled to utilize any means available to defend itself against inadmissible evidence as long as the defendant remains in a defensive posture.

The *Scurlock Oil Co.* case cites two other Supreme Court cases. One is the case of *Roosth & Genecov Production Co. v. White*, 152 Tex. 619, 262 S.W.2d 99 (1953). In that case, the Supreme Court held that an objection to evidence was not waived by cross-examination and *explanatory* testimony after the objectionable evidence was admitted. This case involved the introduction of the replacement of a foundation block after the event which occasioned the lawsuit. The case does not clearly indicate whether or not the explanatory testimony was offered by one of the defendant's witnesses.

The other case cited in the *Scurlock Oil Co.* opinion is the case of *State v. Chavers*, 454 S.W.2d 395 (Tex.1970). This case involved testimony by the State's expert on redirect examination to rebut matters already introduced and about which the expert was questioned concerning "a three hundred dollar sale" which was based on incompetent evidence. The Supreme Court said the State had a right to defend itself, and in so doing did not waive its objection.

In our original opinion, we cited five cases which indicated that the introduction of evidence on a matter which had been objected to when the plaintiff introduced the same, would constitute a waiver of that objection.

In *McDonough v. Zamora*, 338 S.W.2d 507 (Tex.Civ.App.-San Antonio 1960, writ ref'd n.r.e.), the court held that where hearsay testimony was objected to, the objection was waived when the objecting party independently develops the same testimony and offered a letter to that effect. In the case of *Dohoney v. Womack*, 1 Tex.Civ. App. 354, 19 S.W. 883, *aff'd on rehearing*, 20 S.W. 950 (Tex.Civ.App.1892, writ ref'd), the court held that where a deed had been objected to because no proof had been made of the proceedings in a probate court or in the sale and confirmation thereof, this objection was waived when the objecting party introduced the same deed into evidence. In the case of *Simmons v. Capital Diesel & Industrial Machine Works, Inc.*, 380 S.W.2d 191 (Tex.Civ.App.-Amarillo 1964, writ ref'd n.r.e.), the appellant objected to the admission of an offer of compromise. The court held that this objection was waived by the objecting party when that party testified to the check offered in

Subtracting the principal value of $15,000, we arrive at $27,644.57 as the amount of interest

which would have accrued on $15,000 at 10.79% interest, compounded daily for 3,535 days.

settlement of the claim and went into detail as to how the amount was calculated.

In the case of *Maizel v. Bush,* 337 S.W.2d 337 (Tex.Civ.App.-Dallas 1960, writ ref'd n.r.e.), the appellant had objected to testimony explaining the meaning of a contract involved in the case. The court held that the objection was waived when the appellant offered testimony explaining the meaning of the contract. *City of Houston v. Howe & Wise,* 323 S.W.2d 134 (Tex.Civ. App.-Houston 1959, writ ref'd n.r.e.), was a case in which the appellants complained that the appellee went outside the bounds of the contract with certain testimony, and the court found this had been waived because the appellee had also gone outside the bounds of the contract in the questioning of its expert witness, a consulting engineer. However, the court also said that his testimony had to do mainly with his performance under the contract rather than his construction of the contract.

■ It is difficult to reconcile this line of cases with the Supreme Court cases on this issue. Certainly in a situation in which the evidence is objected to because of the failure to lay a proper predicate, the evidence would become admissible if the opposing party brought in evidence which would lay the predicate.

In the present case, numerous references were made during the trial to "blind babies at Wadley." The portion of the record which the Birchfields contend constituted a waiver was the testimony of Dr. Betty Lowe which was as follows:

Q Now Mr. Branson has referred to blind babies as Wadley, over and over again. Other than Kellie, in the years prior to Kellie, were there blind babies from R.L.F. at Wadley Hospital?

A We—there were some babies that had retrolental fibroplasia.

Q Now let me repeat my question. Were there blind babies, plural, other than Kellie, at Wadley Hospital prior to Kellie's birth?

A No, sir.

Q How many blind babies were there at Wadley prior to Kellie, that you know of, Doctor Lowe?

A One.

Q Now there were some babies, just like everywhere else in American (sic), then and now, who had R.L.F., weren't there?

A Yes, sir.

Q And so I think Mr. Branson has been referring to five, so that leaves three babies with R.L.F., and would you tell the ladies and gentlemen of the jury whether or not those three were blind babies, and if not, what was the degree of their visual impairment?

A Can I mention them one by one?

Q Yes. Let's not mention names.

A All right.

Q Just refer to the babies.

A There was one baby, a baby girl born in 1970, who weighed two pounds two ounces. She did indeed have several problems and was a sick baby, and she did have retrolental fibroplasia that is described as being aborted; and what that means is that it's mild, and that child does go to school and does not have that much problem with its vision. There was another baby that was a three pound twin, and she had mild retrolental fibroplasia in one eye. Her care was identical to that of her twin. The twin has no problem with his eyes at all. That child does not have a visual defect, although she does indeed go to an ophthalmologist regularly.

Q Now let me stop you. That child had one perfectly normal eye? Did I understand you correctly?

A Yes, sir, she has some retrolental changes in one eye.

Q All right, and the other eye is perfectly all right?

A That's right.

Q And even the one with the R.L.F. changes in it, does she have vision there?

A Yes, sir.

Q All right, go ahead.

A The next child weighed about eighteen hundred grams, did indeed have

again an ill neonatal course, has retrolental fibroplasia in both eyes and although he is considered legally blind, clinically that child is healthy. He goes to school, public school, with the help of big print books, and I think the last time any of us at Southern Clinic saw him, he had the usual eight, nine year old bicycle type accident that a child frequently has.

Q You mean this blind baby that Mr. Branson talks about does have visual impairment, but is still able to ride his bicycle?

A Yes, sir, there is no question about him having visual impairment. He certainly does, but he is a healthy boy. He does ride his bicycle, he plays ball, and does the activities that he wants to do.

Q And he is going to public school.

A Yes, with the help of large print textbooks.

Q All right, Doctor, that completes the five, quote, "blind babies" at Wadley, does its not?

A There was the baby that was born in '73.

Q That would be the Reppond child?

A Yes, sir.

Q All right, and that child is blind.

A Yes, sir. That baby was actually born at Clarksville, had a great deal of difficulty. He is blind. He does have some brain damage, and at this point in time it would appear that that baby probably had some sort of interuterine difficulty that contributed to his problems long before he was born.

■ The hospital also contends that it should not be considered to have waived its objection, because of evidence which was offered by the physicians and not the hospital. In reconsidering this evidence in light of the *Scurlock Oil Co.* decision allowing defensive measures of explaining, rebutting, or demonstrating the untruthfulness of the objectionable evidence, we find that this evidence did not constitute a waiver.

■ We again examine the record to determine if a proper predicate was laid to the introduction of references to the "five blind babies." [1] Many of the cases involving the laying of a proper predicate for other occurrences involve automobile or train accidents which occurred at the same location, but the Texas cases consistently require that the other occurrences be "reasonably similar" or "under substantially similar conditions." *Missouri Pacific Railroad Co. v. Cooper*, 563 S.W.2d 233 (Tex. 1978); *Nevauex v. Park Place Hospital, Inc.*, 656 S.W.2d 923 (Tex.App.-Beaumont 1983, writ ref'd n.r.e.); *Reynolds & Huff v. White*, 378 S.W.2d 923 (Tex.Civ.App.-Tyler 1964, no writ).

■ The only testimony that the Birchfields contend in their brief laid a predicate for the introduction of the other incidents of RLF is the testimony of the expert witness Dr. Eichenwald.[2] This testimony does not establish that these occurrences were under reasonably similar or substantially similar conditions as the Birchfield baby. Specifically, the evidence does not show what babies or how many babies to which he is making reference, nor does it show that the other babies received excessive or improperly administered supplemental oxygen during the treatment by the hospital and physicians involved in this suit which is the alleged cause of the RLF. The causation was a hotly disputed issue in the suit, and the mere fact that the other children had RLF does not establish that they were treated with supplemental oxygen at Tex-

---

1. We do not refer to the future tense statement alleged to have been made by the party Dr. Lowe that "We are going to have some blind babies at Wadley." This would be admissible as an admission against interest. Rather we address the references to the "five blind babies" or specific cases other than the Birchfield child.

2. The testimony of Dr. Eichenwald was as follows:

Q And did Betty Lowe's prediction come true? That is, they did not get the facilities to accurately monitor, with trained personnel and equipment, the blood gasses of premature infants in Wadley Hospital, and there were blind babies.

A Yes, according to—I think it was Doctor May's deposition ...

arkana Memorial Hospital. (Dr. Eichenwald, an expert witness for the Birchfields, acknowledged that RLF sometimes occurs when no supplemental oxygen is administered.)

In reviewing the record, we find that at least thirty-nine references were made by the attorneys for the Birchfields or by their witnesses to other instances of RLF at the hospital by referring to either "five blind babies" or to the Reppond baby or the Cardwell baby. Twelve of these references were made to the Reppond child, and although a proper predicate was not laid initially, near the end of the trial the following evidence was offered:

Q That—I'm entitled to have you answer my question, and that statement about about both babies is absolutely true. One of them is now nine, and the other one is ten, they both in 1973 and '4 went for hundreds of hours with oxygen therapy and no blood gasses monitered, and they're both stone blind, aren't they?

A That's true.

This evidence is sufficient to establish that the Reppond case was reasonably similar to the present case. We conclude that a proper foundation was laid for the introduction of the Reppond case, although this did not authorize the references to the settlement of this case which we found to be error in the original opinion.

This leaves over twenty references which included references to babies blinded by RLF to which a proper predicate was not laid. These references include the following:

During the testimony of Dr. Eichenwald:

Q Now to your knowledge how many babies have been blinded in that hospital since then?

A Five.

. . . .

Q Unless Wadley Hospital was truly a disaster area, statistically with no more premature infants than they treat, my recollection is maybe one hundred and fifty a year at the outside, in a five-year period, unless it is truly a disaster area going on, could you get five blind babies?

A No. Statistically, that just simply couldn't happen unless things were done very badly. [This question and answer was also read to the jury during the final argument.]

During the testimony of the hospital administrator:

Q All right. Now I want you to assume that the testimony in this case has been so far that after that occurred, in the next several years, next few years, there were five cases of exactly what Betty Lowe was warning against coming out of that nursery, retrolental fibroplasia, in five cases of children that were blinded. Will you assume that for me?

A As the instructions, I will.

During the testimony of Nurse June Derrick:

Q Okay. Do you think the parents of those five blind children that came out of the nursery after Betty Lowe stood up and said if you don't get us some facilities to accurately monitor blood gasses you're going to have some blind babies and you're going to be legally liable, should feel as though you had a really good nursery, ma'am?

During the testimony of Dr. Ehrenkranz:

Q And they had from 1971 to about '76, according to their testimony, five cases of blindness coming out of that hospital. Now does that say anything to you, Doctor, as a neonatologist who treats sick babies?

A It would suggest that there is a problem in the way the babies are being monitored and cared for. If they were all of the same caliber in terms of their status or condition, medical condition, as Kellie—in other words if they were essentially small, well premature infants, it would make me be concerned about how they were monitored, how they were cared for, and specifically the amount of oxygen that they were exposed to. [This

question and answer was also read to the jury during the final argument.]

During the testimony of Dr. Hall:

Q Well, Doctor, you are being sued on a Cardwell baby in another case, aren't you?

A That's the one.

During the testimony of Dr. Lowe:

Q You're a defendant in the Cardwell case which is set in October of this year, aren't you?

A I am a defendant in the Cardwell case.

█ We conclude that these references being a recurring theme throughout the trial constituted error of a nature that is calculated to and probably did cause rendition of an improper verdict. Moreover, when the cumulative effect of the other errors mentioned in our original opinion combines with this error, the probability is multiplied and the judgment cannot stand.

Therefore, this case is reversed and remanded for a new trial.

BLEIL, J., not participating.